## THE JOHN G. STEVENS.

CERTIFICATE FROM THE CIRCUIT COURT OF APPEALS FOR THE SECOND CIRCUIT.

No. 25.  Argued January 27, 1897. — Decided April 18, 1898.

A collision between two vessels by the fault of one of them creates a maritime lien upon her for the damages to the other, which is to be preferred, in admiralty, to a lien for previous supplies.

A lien upon a tug, for damages to her tow by negligent towage bringing the tow into collision with a third vessel, is to be preferred, in admiralty, to a lien for supplies previously furnished to the tug in her home port.

In a pending appeal in admiralty by Edward H. Loud and others, owners of the schooner C. R. Flint, from a decree of the District Court of the United States for the Eastern District of New York in favor of Frederick H. Gladwish and others, coal merchants under the name Gladwish, Moquin & Company, the Circuit Court of Appeals for the Second Circuit certified to this court a question of the priority of maritime lines on the steamtug John G. Stevens, arising, as the certificate stated, upon the following facts:

"The home port of the tug was New York. Between December 7, 1885, and March 7, 1886, Gladwish, Moquin & Company furnished coal to the tug in her home port, and filed notices of liens therefor under the laws of the State of New York of 1862, chapter 482, thereby creating statutory liens on her. On March 8, 1886, the tug John G. Stevens was employed in the port of New York to tow the schooner C. R.

Flint through the waters of said port, and, while towing, negligently allowed the C. R. Flint to collide with the bark Doris Eckhoff in tow of the tug R. S. Carter.

" On March 16, 1886, Loud and others, owners of the C. R. Flint, libelled the John G. Stevens and the R. S. Carter in admiralty, in the District Court of the United States for the Eastern District of New York, for the collision damage. On March 16, 1886, Gladwish and others libelled the John G. Stevens, in the same court, to enforce their supply lien under the state law. The Loud libel resulted in a decree condemning both tugs for damages exceeding $15,000. The Gladwish libel resulted in a decree condemning the John G. Stevens for the coal supplied, and costs, in all $218.07.

" The District Court awarded priority to the supply lien, which exhausts the fund resulting from the sale of the John G. Stevens, leaving the Loud decree unsatisfied." 58 Fed. Rep. 792.

Upon these facts, the Circuit Court of Appeals desired the instruction of this court upon this question of law : " Is the lien for the damages occasioned by negligent towage, which arose on March 8, 1886, to be preferred to the previous state lien for supplies, the libel for supplies being filed last ? "

*Mr. Harrington Putnam* for appellants.

*Mr. Mark Ash* and *Mr. J. Parker Kirlin* for appellees. *Mr. J. H. Lichliter* was on *Mr. Ash's* brief.

Mr. Justice Gray, after stating the case, delivered the opinion of the court.

The question presented by this record is whether a lien upon a tug, for damages to her tow by negligent towage bringing the tow into collision with a third vessel, is to be preferred, in admiralty, to a statutory lien for supplies furnished to the tug in her home port before the collision.

This question may be conveniently divided, in its consideration by the court, as it was in the arguments at the bar, into

two parts: First. Is a claim in tort for damages by a collision entitled to priority over a claim in contract for previous supplies? Second. Is a claim by a tow against her tug, for damages from coming into collision with a third vessel by reason of negligent towage, a claim in tort?

In the case of *The Bold Buccleugh*, 7 Moore P. C. 267, decided in 1852 by the Judicial Committee of the Privy Council, upon appeal from the English High Court of Admiralty, and ever since considered a leading case, both in England and in America, it was adjudged that a collision between two ships by the negligence of one of them created a maritime lien upon or privilege in the offending ship, for the damage done to the other, which attached at the time of the collision, and might be enforced in admiralty by proceedings *in rem* against the offending ship, even in the hands of a *bona fide* purchaser; and Chief Justice Jervis, in delivering judgment, said: "A maritime lien does not include or require possession. The word is used in maritime law, not in the strict legal sense in which we understand it in courts of common law, in which case there could be no lien where there was no possession, actual or constructive; but to express, as if by analogy, the nature of claims which neither presuppose nor originate in possession." "This claim or privilege travels with the thing, into whosesoever possession it may come. It is inchoate from the moment the claim or privilege attaches, and when carried into effect by legal process, by a proceeding *in rem*, relates back to the period when it first attached." And, after observing that this rule could not be better illustrated than by the circumstances of *The Aline*, (1839) 1 W. Rob. 111 — in which Dr. Lushington had expressed the opinion that, in a proceeding *in rem*, the claim for damages must be preferred to a bottomry bond given before the collision; but was not entitled, as against the holder of a like bond given after the collision, to the increased value of the vessel by reason of repairs effected at his cost — Chief Justice Jervis summed up the matter as follows: "The interest of the first bondholder taking effect from the period when his lien attached, he was, so to speak, a part owner in interest at the date of the colli-

sion, and the ship in which he and others were interested was liable to its value at that date for the injury done, without reference to his claim. So, by the collision, the interest of the claimant attached, and dating from that event, the ship in which he was interested having been repaired, was put in bottomry by the master acting for all parties, and he would be bound by that transaction. This rule, which is simple and intelligible, is, in our opinion, applicable to all cases." 7 Moore P. C. 284, 285.

The decision in *The Bold Buccleugh* has never been departed from in England, but has been constantly recognized as sound law in the courts exercising admiralty jurisdiction. *The Europa*, Brown. & Lush. 89, 91, 97; *S. C.* 2 Moore P. C. (N. S.) 1, 20; *The Charles Amelia*, L. R. 2 Ad & Ec. 330, 333; *The City of Mecca,* 6 P. D. 106, 113, 119; *The Rio Tinto*, 9 App. Cas. 356, 360; *The Dictator*, (1892) P. D. 304, 320. And in a very recent case in the House of Lords, that decision has been deliberately and finally declared to have established beyond dispute, in the maritime law of Great Britain, that a collision between two vessels by the fault of one of them creates a maritime lien on her for the damage done to the other. *Currie* v. *McKnight*, (1897) App. Cas. 97.

It has been generally laid down in the English text books that a maritime lien for damages by a collision takes precedence of all earlier maritime liens founded in contract. Abbott on Shipping, (Shee's ed.) pt. 6, c. 4, § 2; Coote's Admiralty Practice, 118; Maclachlan on Shipping, c. 15; Foard on Shipping, 217; Marsden on Collisions, (3d ed.) 82. And the English and Irish courts have even held that a claim for damages from a collision by the negligence of a foreign ship creates a lien upon the whole value of the ship and freight, without deduction for seamen's wages, because, it has been said, the owner of the ship, being personally liable to the seamen for their wages, should not be permitted to deduct expenses for which he is liable, and thus benefit the wrongdoer at the expense of him to whom the wrong has been done. *The Elin*, 8 P. D. 39, 129, and cases there cited.

That a claim for supplies furnished to a vessel should be

preferred to a claim for damages for a subsequent collision appears never to have been even suggested in England, probably because, by the law of England, material-men, without possession, have no maritime lien for supplies, even to a foreign ship, but a mere right to seize the ship by process in admiralty, in the nature of an attachment. *The Rio Tinto*, 9 App. Cas. 356; *The Henrich Björn*, 10 P. D. 44, and 11 App. Cas. 270. "Claims for necessaries," said Dr. Lushington, "do not possess, *ab origine*, a lien; but carry only a statutory remedy against the *res*, which is essentially different." *The Gustaf*, Lush. 506, 508.

There can be no doubt, therefore, that in the English admiralty courts the lien for damages by collision would take precedence of an earlier claim for supplies.

In this country, the principle, applied in the case of *The Bold Buccleugh* to a claim for damages by collision, that a maritime lien is created as soon as the claim comes into being, has long been held to be equally applicable to all claims, which can be enforced in admiralty against the ship, whether arising out of tort or of contract. *General Ins. Co.* v. *Sherwood*, 14 How. 351, 363; *The Creole*, 2 Wall. Jr. 485, 518; *The Mayurka*, 2 Curtis, 72, 77; *The Young Mechanic*, 2 Curtis, 404; *The Kiersage*, 2 Curtis, 421; *The Yankee Blade*, 19 How. 82, 89; *The Rock Island Bridge*, 6 Wall. 213, 215; *The China*, 7 Wall. 53, 68; *The Siren*, 7 Wall. 152, 155; *The Lottawanna*, 21 Wall. 558, 579; *The J. E. Rumbell*, 148 U. S. 1, 10, 11, 20; *The Glide*, 167 U. S. 606.

Accordingly, in our own law, it is well established that a maritime lien or privilege, constituting a present right of property in the ship, *jus in re*, to be afterwards enforced in admiralty by process *in rem*, arises, not only from a collision and for the damages caused thereby; *General Ins. Co.* v. *Sherwood*, *The Rock Island Bridge*, *The Siren* and *The China*, above cited; but also for necessary supplies or repairs furnished to a vessel, whether under the general maritime law in a foreign port, or according to a local statute in her home port. *The Young Mechanic*, *The Kiersage*, *The Lottawanna*, *The J. E. Rumbell* and *The Glide*, above cited.

Some years before the decision in *The Bold Buccleugh*, Mr. Justice Story had clearly recognized the existence of a maritime lien, as well for damages by collision; *The Malek Adhel*, 2 How. 210, 234; as for supplies in a foreign port, regarding which he observed: "A material-man, who furnishes supplies in a foreign port, or to a foreign ship, relies on the ship itself as his security. He may, if he pleases, insist upon a bottomry bond with maritime interest, as the security for his advances; in which case, he gives credit exclusively to the ship, and must take upon himself the risk of a successful accomplishment of the voyage. But if he is content with receiving the amount of his advances and common interest, he may rely on that tacit lien or claim, which the maritime law gives him upon the ship itself, in addition to the personal security of the owners. Wherever a lien or claim is given upon the thing by the maritime law, the admiralty will enforce it by a proceeding *in rem*; and, indeed, it is the only court competent to enforce it." *The Nestor*, 1 Sumner, 73, 78. And it is worthy of note that the last part of this observation was quoted and relied on in the judgment in *The Bold Buccleugh*. 7 Moore P. C. 284.

By our law, then, a claim for damages by collision, and a claim for supplies, are both maritime liens. The question of their comparative rank is now for the first time presented to this court for adjudication; and it has been the subject of conflicting decisions in other courts of the United States, and especially in those held within the State of New York.

In *The America*, (1853) Judge Hall, in the Northern District of New York, appears to have held liens for collisions and those for supplies to be of equal rank, without regard to the date when they attached to the ship. 16 Law Reporter, 264. A claim for damages by collision has been postponed to an earlier claim for supplies, by Judge Brown, in the Southern District of New York, in *The Amos D. Carver*, 35 Fed. Rep. 665; but has been preferred to such a claim, by Judge Benedict, in the Eastern District of New York, and by Mr. Justice Blatchford on appeal, in *The R. S. Carter & The John G. Stevens*, 38 Fed. Rep. 515, and 40 Fed. Rep. 331. And, in an

earlier case, a claim for collision had been allowed by Judge Benedict a like preference over a previous bottomry bond. *The Pride of the Ocean*, 3 Fed. Rep. 162.

The preference due to the lien for damages from collision, over earlier claims founded on contract, has been carried so far as to allow the lien for damages to prevail over the claim of seamen for wages earned before the collision, by Judge Lowell, in the District of Massachusetts, in *The Enterprise*, 1 Lowell, 455; by Judge Nixon, in the District of New Jersey, in *The Maria & Elizabeth*, 12 Fed. Rep. 627; by Judges Gresham and Jenkins, in the Circuit Court of Appeals for the Seventh Circuit, in *The F. H. Stanwood*, 9 U. S. App. 15; and by Judge Swan, in the Eastern District of Michigan, in *The Nettie Woodward*, 50 Fed. Rep. 224. The opposite view has been maintained, in the Southern District of New York, by Judge Choate, in *The Orient*, 10 Benedict, 620, as well as by Judge Brown, in *The Amos D. Carver*, 35 Fed. Rep. 665, above cited; and in the Eastern District of New York, by Judge Benedict, in *The Samuel J. Christian*, 16 Fed. Rep. 796; and in the Western District of Michigan, by Judge Severens, in *The Daisy Day*, 40 Fed. Rep. 538.

The case at bar, however, presents no question of the comparative rank of seamen's wages, which may depend upon peculiar considerations, and which, according to the favorite saying of Lord Stowell and of Mr. Justice Story, are sacred liens, and, as long as a plank of the ship remains, the sailor is entitled, against all other persons, to the proceeds as a security for his wages. *The Madonna D'Idra*, 1 Dodson, 37, 40; *The Sydney Cove*, 2 Dodson, 11, 13; *The Neptune*, 1 Hagg. Adm. 227, 239; *Sheppard* v. *Taylor*, 5 Pet. 675, 710; *Brown* v. *Lull*, 2 Sumner, 443, 452; *Pitman* v. *Hooper*, 3 Sumner, 50, 58; Abbott on Shipping, pt. 4, c. 4, § 8; 3 Kent Com. 197. Yet see *Norwich Co.* v. *Wright*, 13 Wall. 104, 122.

Nor does this case present any question between successive liens for repairs or supplies, the general rule as to which is that they are to be paid in inverse order, because it is for the benefit of all the interests in the ship that she should be kept in condition to be navigated. Abbott on Shipping, pt. 2,

c. 3, § 32; *The St. Jago de Cuba*, 9 Wheat. 409, 416; *The J. E. Rumbell*, 148 U. S. 1, 9; *The Fanny*, 2 Lowell, 508, 510.

Nor does it present a question of precedence between two claims for distinct and successive collisions, as to which there has been a difference of opinion in the Southern District of New York; Judge Choate, in the District Court, giving the preference to the later claim, upon the ground that the interest created in the vessel by the first collision was subject, like all other proprietary interests in her, to the ordinary marine perils, including the second collision; and Mr. Justice Blatchford, in the Circuit Court, reversing the decree, because the vessel libelled had not been benefited, but had been injured, by the second collision. *The Frank G. Fowler*, 8 Fed. Rep. 331, and 17 Fed. Rep. 653.

Nor yet does it present the question whether a lien for repairs made after the collision, so far as they increase the value of the vessel, may be preferred to the lien for the damages by the collision, in accordance with the English cases of *The Aline* and *The Bold Buccleugh*, cited at the beginning of this opinion.

But the question we have to deal with is whether the lien for damages by the collision is to be preferred to the lien for supplies furnished before the collision.

The foundation of the rule that collision gives to the party injured a *jus in re* in the offending ship is the principle of the maritime law that the ship, by whomsoever owned or navigated, is considered as herself the wrongdoer, liable for the tort, and subject to a maritime lien for the damages. This principle, as has been observed by careful text writers on both sides of the Atlantic, has been more clearly established, and more fully carried out, in this country than in England. Henry on Admiralty, § 75, note; Marsden on Collisions, (3d ed.) 93.

The act of Congress of December 22, 1807, c. 5, laid an embargo on all ships and vessels, within the limits and jurisdiction of the United States, bound to any foreign port or place; and the supplemental act of January 9, 1808, § 3, provided that any ship or vessel proceeding, contrary to the provi-

sions of the act, to a foreign port or place, should be forfeited. 2 Stat. 451, 453. Upon the trial of a libel in the Circuit Court of the United States to enforce the forfeiture of a vessel under those acts, Chief Justice Marshall said : " This is not a proceeding against the owner; it is a proceeding against the vessel, for an offence committed by the vessel, which is not less an offence, and does not the less subject her to forfeiture, because it was committed without the authority and against the will of the owner." *The Little Charles*, 1 Brock. 347, 354.

Upon a libel of information for the condemnation of a piratical vessel, under the act of Congress of March 3, 1819, c. 77, continued in force by the act of May 15, 1820, c. 113, (3 Stat. 510, 600,) Mr. Justice Story, delivering the opinion of this court, and referring to seizures in revenue causes, said : " The thing is here primarily considered as the offender, or rather the offence is attached primarily to the thing; and this, whether the offence be *malum prohibitum* or *malum in se.* The same principle applies to proceedings *in rem*, on seizures in the admiralty." *The Palmyra*, 12 Wheat. 1, 14.

In *The Malek Adhel*, 2 How. 210, 233, 234, Mr. Justice Story, in delivering judgment, stated the principle more fully, saying : " It is not an uncommon course in the admiralty, acting under the law of nations, to treat the vessel in which or by which, or by the master or crew thereof, a wrong or offence has been done, as the offender, without any regard whatsoever to the personal misconduct or responsibility of the owner thereof. And this is done from the necessity of the case, as the only adequate means of suppressing the offence or wrong, or insuring an indemnity to the injured party." And, after quoting the passages above cited from the opinions in *The Little Charles* and in *The Palmyra*, he added : " The ship is also, by the general maritime law, held responsible for the torts and misconduct of the master and crew thereof, whether arising from negligence or a wilful disregard of duty ; as, for example, in cases of collision and other wrongs done upon the high seas, or elsewhere within the admiralty and maritime jurisdiction, upon the general policy of that law, which looks to the instrument itself, used as the

means of the mischief, as the best and surest pledge for the compensation and indemnity to the injured party."

In *The China*, 7 Wall. 53, 68, by the application of the same principle, a ship was held liable for damages by collision through the negligence of a pilot whom she had been compelled by law to take on board; and Mr. Justice Swayne, in delivering judgment, said: "The maritime law as to the position and powers of the master, and the responsibility of the vessel, is not derived from the civil law of master and servant, nor from the common law. It had its source in the commercial usages and jurisprudence of the middle ages. Originally, the primary liability was upon the vessel, and that of the owner was not personal, but merely incidental to his ownership, from which he was discharged either by the loss of the vessel or by abandoning it to the creditors. But while the law limited the creditor to this part of the owner's property, it gave him a lien or privilege against it in preference to other creditors." "According to the admiralty law, the collision impresses upon the wrongdoing vessel a maritime lien. This the vessel carries with it into whosesoever hands it may come. It is inchoate at the moment of the wrong, and must be perfected by subsequent proceedings."

The same principle has been recognized in other cases. *The John Fraser*, 21 How. 184, 194; *The Merrimac*, 14 Wall. 199; *The Clarita & The Clara*, 23 Wall. 1; *Ralli* v. *Troop*, 157 U. S. 386, 402, 403.

That the maritime lien upon a vessel, for damages caused by her fault to another vessel, takes precedence of a maritime lien for supplies previously furnished to the offending vessel, is a reasonable inference, if not a necessary conclusion, from the decisions of this court, above referred to, the effect of which may be summed up as follows:

The collision, as soon as it takes place, creates, as security for the damages, a maritime lien or privilege, *jus in re*, a proprietary interest in the offending ship, and which, when enforced by admiralty process *in rem*, relates back to the time of the collision. The offending ship is considered as herself the wrongdoer, and as herself bound to make compen-

sation for the wrong done. The owner of the injured vessel is entitled to proceed *in rem* against the offender, without regard to the question who may be her owners, or to the division, the nature or the extent of their interests in her. With the relations of the owners of those interests, as among themselves, the owner of the injured vessel has no concern. All the interests, existing at the time of the collision, in the offending vessel, whether by way of part-ownership, of mortgage, of bottomry bond or of other maritime lien for repairs or supplies, arising out of contract with the owners or agents of the vessel, are parts of the vessel herself, and as such are bound by and responsible for her wrongful acts. Any one who had furnished necessary supplies to the vessel before the collision, and had thereby acquired, under our law, a maritime lien or privilege in the vessel herself, was, as was said in *The Bold Buccleugh*, before cited, of the holder of an earlier bottomry bond, under the law of England, ":so to speak, a part owner in interest at the date of the collision, and the ship in which he and others were interested was liable to its value at that date for the injury done, without reference to his claim." 7 Moore P. C. 285.

We are then brought to the question, whether a claim by a tow against her tug, for damages from coming into collision with a third vessel because of negligent towage, is a claim in tort, standing upon the same ground as a claim of the third vessel for damages against the tug.

Upon this question, again, there have been conflicting opinions in the District Courts of the United States.

On the one hand, it has been held by Judge Benedict, in the Eastern District of New York, in several cases, including the case at bar, that a claim by a tow against her tug for damages caused by the negligence of the latter is founded on a voluntary contract between the owner of the tow and the owner of the tug, and should be postponed to a claim against the tug for necessary supplies or repairs furnished before the contract of towage was made. *The Samuel J. Christian*, 16 Fed. Rep. 796; *The John G. Stevens*, 58 Fed. Rep. 792; *The Glen Iris*, 78 Fed. Rep. 511. The same conclusion has been

reached by Judge Brown, in the Southern District of New York, proceeding upon the hypothesis that the security for the maritime obligation created by the contract of towage is subject to all liens already existing upon the vessel, and upon the theory that, by the general maritime law, liens *ex delicto*, including all liens for damage by collision, are inferior in the rank of privilege to liens *ex contractu*. *The Grapeshot*, 22 Fed. Rep. 123; *The Young America*, 30 Fed. Rep. 789; *The Gratitude*, 42 Fed. Rep. 299.

On the other hand, the claim by a tow against her tug for damages caused by negligent towage has been held to be founded in tort, arising out of the duty imposed by law, and independent of any contract made, or consideration paid or to be paid, for the towage, by Mr. Justice Blatchford, when District Judge, in *The Brooklyn*, 2 Benedict, 547, and in *The Deer*, 4 Benedict, 352; by Judge Lowell, in *The Arturo*, 6 Fed. Rep. 308; and by Judge Swing, in the Southern District of Ohio, in *The Liberty*, 7 Fed. Rep. 226, 230. In *The Arturo*, Judge Lowell said: "These cases of tow against tug are, in form and fact, very like collision cases. The contract gives rise to duties very closely resembling those which one vessel owes to others which it may meet. There is, therefore, an analogy between the two classes of cases so close that the tow may sue, in one proceeding for damage, her own tug and a strange vessel with which there has been a collision." 6 Fed. Rep. 312. And it has accordingly been held, by Judge Nixon, and by Judge Severens, that such a claim by a tow against her tug is entitled to priority of payment over liens on the tug for previous repairs or supplies. *The M. Vandercook*, 24 Fed. Rep. 472, 478; *The Daisy Day*, 40 Fed. Rep. 538.

The decisions of this court are in accordance with the latter view, and are inconsistent with any other.

It was argued that the liability of a tug for the loss of her tow was analogous to the liability of a common carrier for the loss of the goods carried. But even an action by a passenger, or by an owner of goods, against a carrier, for neglect to carry and deliver in safety, is an action for the breach of a

duty imposed by the law, independently of contract or of consideration, and is therefore founded in tort. *Philadelphia & Reading Railroad* v. *Derby*, 14 How. 468, 485 ; *Atlantic & Pacific Railroad* v. *Laird*, 164 U. S. 393.

In *Norwich Co.* v. *Wright*, 13 Wall. 104, 122, Mr. Justice Bradley, referring to Maclachlan on Shipping, (1st ed.) 598, laid down these general propositions : " Liens for reparation for wrong done are superior to any prior liens for money borrowed, wages, pilotage, etc. But they stand on an equality with regard to each other if they arise from the same cause." Although these propositions went beyond what was required for the decision of that case, which was one of a collision between two vessels, owing to the fault of one of them, causing the loss of her cargo, as well as of the other vessel and her cargo, yet the very point adjudged was that the lien on the offending vessel for the loss of her own cargo was a lien for reparation of damage, and therefore was upon an equality with the lien upon her for the loss of the other vessel and her cargo.

This court, more than once, has directly affirmed that a suit by the owner of a tow against her tug, to recover for an injury to the tow by negligence on the part of the tug, is a suit *ex delicto* and not *ex contractu.*

In *The Quickstep*, 9 Wall. 665, 670, a libel by the owner of a tow against her tug set forth a contract with the tug, for a stipulated price, to tow directly, and a deviation and unreasonable delay in its performance; and that the tug negligently backed into the tow and injured her. An objection that the libel could not be maintained, because the contract alleged was not proved, was overruled by this court. Mr. Justice Davis, in delivering judgment, said : " The libel was not filed to recover damages for the breach of a contract, as is contended, but to obtain compensation for the commission of a tort. It is true it asserts a contract of towage, but this is done by way of inducement to the real grievance complained of, which is the wrong suffered by the libellant in the destruction of his boat by the carelessness and mismanagement of the captain of the Quickstep."

Again, in *The Syracuse*, 12 Wall. 167, 171, which was a libel by a tug against her tow for negligently bringing her into collision with a vessel at anchor, the court, speaking by the same justice, said : " It is unnecessary to consider the evidence relating to the alleged contract of towage, because, if it be true, as the appellant says, that by special agreement the canal boat was being towed at her own risk, nevertheless the steamer is liable, if, through the negligence of those in charge of her, the canal boat suffered loss.  Although the policy of the law has not imposed on the towing boat the obligation resting on a common carrier, it does require, on the part of the persons engaged in her management, the exercise of reasonable care, caution and maritime skill, and if these are neglected, and disaster occurs, the towing boat must be visited with the consequences."  And see *The J. P. Donaldson*, 167 U. S. 599, 603.

The essential likeness between the ordinary case of a collision between two ships, and the liability of a tug to her tow for damages caused to the latter by a collision with a third vessel, is exemplified by the familiar practice in admiralty, (followed in the very proceeding in which the question now before us arose,) which allows the owner of a tow, injured by a collision caused by the conduct of her tug and of another vessel, to sue both in one libel, and to recover against either or both, according to the proof at the hearing. . *The Alabama & The Gamecock*, 92 U. S. 695; *The Atlas*, 93 U. S. 302; *The L. P. Dayton*, 120 U. S. 337; *The R. S. Carter & The John G. Stevens*, 38 Fed. Rep. 515, and 40 Fed. Rep. 331.

The result of applying to the case at bar the principles of the maritime law of the United States, as heretofore declared by this court, is that the lien for the damages occasioned by negligent towage must be preferred to the previous lien for supplies.

In the argument of this case, copious references were made to foreign codes and commentaries, which we have not thought it important to consider, because they differ among themselves as to the comparative rank of various maritime liens, and because the general maritime law is in force in this country,

or in any other, so far only as administered in its courts, or adopted by its own laws and usages. *The Lottawanna,* 21 Wall. 558, 572; *The Belgenland,* 114 U. S. 355, 369; *Liverpool Steam Co.* v. *Phenix Ins. Co.,* 129 U. S. 397, 444; *Ralli* v. *Troop,* 157 U. S. 386, 407.

*Question certified answered in the affirmative.*