### THE TEMPLE EMERY.

#### (District Court, E. D. Wisconsin. April 20, 1903.)

**1. TOWAGE—NEGLIGENCE OF TUG—GROUNDS OF LIABILITY.**

The liability of a tug for damages caused by negligent towage is founded on tort, arising out of the duty imposed by law, and independ- ent of any contract made or consideration paid or to be paid for the towage; and a suit in rem may be maintained by the owner of the tow to enforce such liability, although at the time of the injury the tow was under charter to the owner of the tug.

**2. SAME—MEASURE OF CARE REQUIRED.**

A tug engaged in a towage service is bound to exercise such maritime skill and care as may reasonably be required under all the circumstan- ces and conditions of the particular case.

**3. SAME—EVIDENCE CONSIDERED.**

Evidence considered, and *held* to show that the injury of a combination dredge and pile driver, which capsized while in tow, was due to the negligence of the tug in starting out in Green Bay with an unwieldy double tow, when the sea was rough and in a stormy season, without necessity and against the protest of the owner of the dredge, which was a difficult craft to handle in stormy weather, in attaching the line to one tow post, only, on a corner of the dredge, and in holding onto the second tow, consisting of a raft of boom sticks, after the wind had in- creased, and the safety of the dredge was endangered thereby.

In Admiralty. Libel in rem for loss of tow, consisting of a com- bined dredge and pile driver, through the alleged negligence of the tug.

The libelant, owning the dredge and pile driver (hereinafter called the pile driver) at Menominee, agreed with Mann Bros., in form, though in fact with Two Rivers Manufacturing Company, claimant, to let it for temporary use of the latter at Ford river, near Escanaba, at $25 per day. As this use required removal of the pile driver from Menominee to Ford river, down the west shore of Green Bay, in the month of November, the libelant proposed to furnish the tug for such towage, but finally acquiesced in the claimant's proposal to have the tug Temple Emery take the pile driver, in connection with her tow of boom sticks, and thus save expense to the claimant, who was chargeable therefor. The pile driver consisted of a scow, 16 feet beam,

50 feet long, and 5 feet deep, carrying at one end leaders 40 feet high, at the other end the dredging appliances, and amidships the engine and boiler; making it an awkward craft to handle in stormy weather. It was taken in tow by the tug Temple Emery November 2d, on 550 feet of line, with 200 boom sticks on a wire cable 1,150 feet astern of the tug. After running a few miles, the tow returned to Menominee on account of wind and sea, resumed the voyage after midnight, and ran to Chambers Island, where they remained during the forenoon, both for shelter and to put the pile driver in order, and then started on the course northward, with wind and sea quieted down. A storm sprang up from the northwest, with high wind, snow, and rain, and the scow capsized; dumping the attachments, which were thus lost. Other circumstances are mentioned in the opinion. The libel avers negligence on the part of the tug in several particulars as grounds of liability for such loss.

M. C. Krause, for libelant.
C. E. Kremer, for claimant.

SEAMAN, District Judge (after stating the facts). The testimony is undisputed that the pile driver was taken in tow by the tug for account of Two Rivers Manufacturing Company, owners of the tug, under their contract with the libelant for use of the pile driver at Ford river, so that the loss occurred under this contract of hire, and not under a particular contract for towage, as charged in one of the articles of the libel. For this reason the respondent contends that the libel must be dismissed, on the proposition that liability of the tug in rem can be predicated only on a contract of towage, and, failing such contract relation between the libelant and respondent, the latter is "in no way responsible or answerable" to the owner for "the safety of the dredge." In like view, it is further contended that any right of action for the loss "must be based upon the charter party," and is in personam, and not in rem. I am of opinion that neither of these contentions is tenable. The authorities clearly establish the doctrine that liability of a tug for damages caused by negligent towage is "founded on tort, arising out of the duty imposed by law, and independent of any contract made, or consideration paid or to be paid, for the towage." The John G. Stevens, 170 U. S. 113, 124, 18 Sup. Ct. 544, 42 L. Ed. 969, and cases reviewed. In the suggestion on the brief of proctor for the respondent that the ruling of Judge Blatchford to the above effect in The Brooklyn, 2 Ben. 547, 4 Fed. Cas. 238 (No. 1,938), stands alone for such proposition, the case above cited and the several cases there reviewed and approved appear to have been overlooked. The decision in Steamer Syracuse, 12 Wall. 167, 171, 20 L. Ed. 382, rests upon the same doctrine, and the liability of the respondent for the loss in question, if fault appears, is undoubted. The allegations of the libel are sufficient for this purpose—at least, may be so treated at the present stage—and such as relate to the contract with the claimants are immaterial.

Coming to the consideration of the merits, the testimony is conflicting as to important circumstances, but I am satisfied that the liability of the respondent is fairly established by the evidence. While the undertaking to tow does not assume the obligation of an insurer, nor liability as a common carrier, it requires the exercise of "that degree of caution and skill which prudent navigators usually employ

in similar services"; and, if loss occurs from failure or neglect therein, the towing steamer must respond in damages. The Webb, 14 Wall. 406, 414, 20 L. Ed. 774; The Syracuse, 12 Wall. 167, 171, 20 L. Ed. 382; The J. P. Donaldson, 167 U. S. 599, 603, 17 Sup. Ct. 951, 42 L. Ed. 292. The maritime skill and care thus called for is such as is reasonable in that service and under the conditions presented—such as may reasonably be demanded under "the peculiar circumstances and emergencies of the case." The Adelia, 1 Hask. 505, Fed. Cas. No. 79; The Somers N. Smith (D. C.) 120 Fed. 569, 571.

The tug started out with this unwieldy double tow on the afternoon of November 2d (a season when storms are usual), with a southeast wind and sea; and this after remonstrance on the part of the libelant, by telephone to the claimants, that it was blowing a gale, and asking them to have the tug leave the pile driver, to be taken down later by the libelant. The witnesses do not agree as to the distance or course the tow proceeded, or upon the extent the scow sheered in towing, but all concur that the weather compelled return to Menominee. After midnight the tow was resumed, reaching Chambers Island early in the morning, and making harbor there for shelter, and to repair crane lashings on the pile driver, and siphon her out. Shortly before noon they were again started on the course northward, wind and sea having calmed down; but within an hour a blow sprang up from the northwest, with rain and snow, raising quite a sea, so that the scow towed badly, and the speed was reduced to one mile an hour. Thus running—substantially head to the wind, and on a proper course for the west (weather) shore, according to the testimony which seems to me best entitled to credit—the scow capsized about two hours later; and, when the shore was reached, all of its machinery and appliances were lost.

The main conflicts in the testimony relate to the manner in which the pile driver towed, the force of the wind, and the course of the tow after leaving Chambers Island and up to the disaster. As above intimated, I adopt the view of respondent's witnesses that the tug headed for the west shore soon after the storm struck her; and that was the proper course, for the reason that such shore afforded an excellent lee, and within a mile of it the tow would be comparatively safe from the storm then prevailing. The master and mate of the tug state the force of the wind which struck them before the disaster at 40 miles an hour. The libelant's witness, who was on the tug, calls it "not a gale," but says that "the wind was quite hard," and raised "a good-sized sea." Report of the Weather Bureau for Escanaba Station, showing the "hourly wind movement" November 2d and 3d (stipulated in evidence), is persuasive upon this point, and, as well, in reference to the conditions when the tow started from Menominee. It shows at Escanaba the same direction of wind as that encountered by the tow; that on the 2d, from 5 p. m. to 12 m., the wind was 13 to 14 miles; that it reached 18 miles from 1 to 2 a. m. of the 3d, was 17 between 10 and 11 a. m.—all southeast—and then turned south and moderated to 10 and 11 miles; that from 2 to 3 p. m. it was northwest at 18 miles, and varied from 14 to 18 until night. While the velocity may have been higher at the points in question, this record

justifies the view that the force of the northwest wind, under which the disaster occurred, was not greatly in excess of the southeast wind, under which the master ventured out of Menominee with his tow. In reference to the manner in which the tow followed the tug, it is conceded that she sheered, and I have no doubt that the sheer was considerable. As this difficulty was noticeable from the outset, the towing tug was bound to adopt such course as prudence demanded for the safety of the tow, in that light.

Adopting these conclusions upon the disputed facts, those which are material and uncontroverted may be thus summarized: (1) The pile driver was taken in tow, with no immediate necessity therefor, when the weather was at least not favorable for such a craft, and when her bad towing qualities under such conditions were obvious. (2) The towline was attached to one tow post only, at one corner of the scow, and thence around and through the leaders to the tug. The well-recognized method for towing scows and like craft is to attach the towline, by means of a bridle, to both corners, for which proper tow posts were provided in this instance; and the proof is abundant that this means tends to prevent sheering, so that the tow follows the tug with reasonable steadiness, while the single attachment adopted in this case permits excessive sheering, and is neither customary nor deemed prudent. The master of the tug states that the line was thus attached to the single tow post because the other post was broken, and for the further reason that he deemed it equally safe with a scow of only 16-feet beam; but the proof is conclusive that the second tow post was in good condition and available. (3) The testimony satisfactorily shows that the boom sticks incumbered the tow, and that the safety of the pile driver was endangered thereby; that it was imprudent, under the circumstances, to retain the boom sticks in tow, either on leaving Menominee, or on leaving the harbor at Chambers Island, after the experience of the night passage, or ultimately after the change of wind to the northwest. It may be true, as the master states, that the tug was capable, in moderate weather, of towing as fast with both as the pile driver could be safely towed, but I am satisfied that this was not the case under the weather conditions which were presented. Without the boom sticks, whereby the speed was held down to a mile an hour after the storm arose, no reason appears for doubt that the pile driver could have been taken to a place of safety under the lee of the west shore, and that such was the only prudent course then open for the safety of the pile driver, while the boom sticks could have been picked up later.

Upon the facts so appearing, and in the light of the expert testimony, I am of opinion that the loss of the libelant's property was caused by neglect of precautions on the part of the tug which reasonable seamanship, under the circumstances, demanded, and the duty of towage required. The sheering of the scow and her unsteady action in the sea were the undoubted cause of the disaster; and the theory advanced, that she "sprung a leak forward" from heading against the sea, and that the scow thus became waterlogged, with spray coming through her decks as well, is unsupported by the testimony. The safety of the tow was subordinated to the purpose of sav-

ing an extra trip by the tug, and for failure to exercise due care therein the court must pronounce for recovery by the libelant for the resulting loss.

It is so ordered.