## THE EVOLUTION.

### (District Court, D. Massachusetts. January 30, 1912.)

### No. 561.

1. COLLISION (§ 71*)—SCHOONER BREAKING FROM ANCHORAGE—DEFECTIVE APPLIANCES.

A schooner, which drifted from her anchorage during a storm not more violent than might ordinarily be expected, by reason of the parting of an anchor chain, which was old and insufficient, *held* solely in fault for a collision with another anchored vessel to her leeward.

[Ed. Note.—For other cases, see Collision, Cent. Dig. § 101; Dec. Dig. § 71.*]

2. SALVAGE (§ 13*)—SALVAGE SERVICES—TOWING SCHOONER TO SAFE ANCHORAGE—COMPENSATION.

A tug, which voluntarily went to the assistance of a schooner in an exposed outer harbor during a storm, where, her anchor chains having parted, she was held by lines made fast to another anchored schooner, and in response to her signals for assistance towed her to a safe anchorage in the inner harbor, *held* entitled to a salvage award of $50; the service requiring about two hours.

[Ed. Note.—For other cases, see Salvage, Cent. Dig. §§ 23–25; Dec. Dig. § 13.*

Salvage awards in federal courts, see note to The Lamington, 30 C. C. A. 280.]

3. SALVAGE (§ 7*)—SALVAGE SERVICES—HOLDING DRIFTING VESSEL IN STORM.

The schooner Evolution, lying anchored at night in an exposed outer harbor, during a storm, parted one of her anchor chains, and, dragging her other anchor, fouled the schooner M. D. S., and after parting from her second anchor made fast by another line, furnished by the M. D. S., which so held her until morning, when she was taken away by a tug. There were no other means of assistance at hand, and, but for that of the M. D. S., she would undoubtedly have drifted on the rocks and been wrecked. *Held,* that the service of the M. D. S. entitled her to a salvage reward.

[Ed. Note.—For other cases, see Salvage, Cent. Dig. §§ 13, 26; Dec. Dig. § 7.*].

4. SEAMEN (§ 27*)—PRIORITIES OF LIENS—WAGES OF SEAMEN AND COLLISION DAMAGES.

The lien for wages earned prior to a collision by the crew of the vessel in fault is inferior to that for the damages caused by the collision.

[Ed. Note.—For other cases, see Seamen, Cent. Dig. §§ 4, 157–169; Dec. Dig. § 27.*]

In Admiralty. Suit by Alexander Watson, owner of the schooner M. D. S., against the schooner Evolution, for salvage and collision damages; also petition for salvage by the Mariners' Towboat Company, owner of the tug Eveleth. Decree for both libelants.

Carver, Wardner & Goodwin, for libelant and petitioner.
Blodgett, Jones & Burnham, for claimant.

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

DODGE, District Judge. The libelant is the owner of the British schooner M. D. S. On November 12, 1911, while bound on a voyage, under charter, from Hantsport to Vineyard Haven for orders, then to discharge in Long Island Sound or at New York, she anchored in Gloucester outer harbor, just inside the breakwater. On November 16, the Evolution, also a British vessel, came into the harbor and anchored near by. Both vessels remained at anchor until the night between Saturday, November 18th, and Sunday, November 19th, when the wind began to blow strong from the southwest, and increased in force until it became a considerable gale. Soon after 1 a. m., the Evolution, being to windward of the M. D. S. and having two anchors down, broke adrift from one anchor, dragged the other, came down upon the M. D. S., and fouled her, carrying away her jib boom, bowsprit, with the rigging and head gear attached. After getting clear, the Evolution swung to her port anchor and also made herself fast with a line to the quarter of the M. D. S. Thus the vessels lay until about 3:15 a. m., when the Evolution broke adrift a second time, from her port anchor, still holding, however, by the line fast to the M. D. S. Another line was passed to her from the M. D. S., and she lay astern of that vessel, secured by these two lines, until nearly 5 a. m., when the Evolution's line parted, and another part of the line belonging to the M. D. S. had to be used instead. This held her till after 7 a. m., when the tugboat Eveleth came down from Gloucester to where the vessels lay, and towed the Evolution to a safe anchorage in the inner harbor. The wind had continued to blow heavily from the time she first broke adrift until she was safely anchored as above.

The owner of the M. D. S. claims salvage for keeping the Evolution from going ashore during the time she remained attached to his vessel, and claims damages for the collision. The master and crew of the M. D. S. join as libelants for salvage. The Mariners' Towboat Company, which owns the Eveleth, has presented a claim for salvage. No claim to the Evolution has been filed, nor is there any answer to the libel on her behalf. She was sold by the marshal on December 16th for $650, and $583.71, being the net proceeds of her sale, is in the registry. Ernest Eye and three others, claiming to have been the crew of the Evolution, have presented claims for wages due them, which they ask to have paid out of these proceeds.

The hearing has been ex parte so far as the Evolution is concerned, but the libelant has contested the claim of the towboat and the wages claim.

[1] I have no hesitation in finding the Evolution in fault for the collision. She is presumptively in fault for fouling a vessel at anchor, and there is evidence sufficient to show that both the anchor chains which she was using parted because they were old, insufficient, and unsafe. Although the wind was strong at the time, there is nothing to show that either the wind or the sea caused by it were heavier than ought ordinarily to be expected on such a voyage, or heavier than reasonably sufficient tackle would have resisted.

Passing for the present the claims of the Evolution's crew, if the

Eveleth has a salvage claim, it is entitled to precedence as against the proceeds, because her salvage services were latest in order; and if the M. D. S. has a salvage claim, it ranks next. If salvage compensation is due either or both these vessels, the fact that there are now proceeds in court, available for the payment either of collision damages or wages, is partly or wholly because of the services for which such compensation is to be made.

. [2] As to the Eveleth's services, I cannot hold that they were mere towage services, deserving only 'the ordinary towage compensation of $6. The tug, learning that there was a schooner in the outer harbor which might need assistance, voluntarily went down there to look for her, found the Evolution signaling for assistance, and tendered her services, which were accepted without inquiry or bargain. The Evolution's peril lay in the prospect that the M. D. S. might, for her own safety, be forced to decline to hold the Evolution longer by the strong wind and sea, which did not then appear likely to diminish, or in the prospect that the lines connecting the two vessels might part. The evidence does not satisfy me that the immediate danger of either event happening was very great, but it was impossible to tell at the time just how great the danger was. The Evolution, once adrift, was helpless to navigate by herself, and the rocky shore to lee-, ward was close at hand, as was also another vessel, still nearer to leeward. There was no prospect of any other immediate assistance. Though the actual time occupied by the tug's services was only about two hours, and the actual distance traversed by her in rendering them only about 2½ miles in all, I think the circumstances, though not justifying any great addition to the towage value of the services, entitle her to an award of $50.

[3] The services of the M. D. S. consisted in permitting the Evolution to be made fast to her for several hours, and thus holding her safe from the fate of drifting ashore. Extra strain was, of course, thereby put upon the M. D. S. and her anchor, which had to hold both vessels during the time. One of the lines used, as has been stated, belonged to the M. D. S., and this line was passed to the Evolution, at the time her own line parted, by some of the crew in the boat of the M. D. S. It was dark during the greater part of the time while the vessels remained fast to each other, so that there was no opportunity to signal for or obtain other assistance. Counsel have not cited, nor have I found, any case in which services similar to these have been compensated as salvage services; but the M. D. S. was under no legal obligation to render them, and they benefited the Evolution. Having voluntarily permitted another vessel thus to make use of and endanger her, it can hardly be just to deny her any claim to compensation. The often quoted statement in The Blackwall, 10 Wall. 1, 11, 19 L. Ed. 870, "Useful services of any kind, rendered to a vessel or her cargo, exposed to any impending danger and imminent peril of loss or damage, may entitle those who render such services to salvage reward," covers this case. The benefit derived by the Evolution from these services seems to me, on the whole, not less considerable than that derived from those rendered by the tug, but

not materially greater, and I shall award for them the same amount of $50.

[4] Unless the Evolution's crew have a prior claim for wages, all that remains of the proceeds must go to the owners of the M. D. S. in satisfaction of their damage claim, which will, in any event, much exceed the entire proceeds in amount. Whatever the decisions may have been in other districts, in this district the lien for wages earned prior to the collision, by the crew of the vessel in fault, has always been postponed to the lien for damages caused by the collision. The Enterprise, 1 Lowell, 455, Fed. Cas. No. 4,498. We are dealing here with a British vessel, as was Judge Lowell in The Enterprise. Judge Lowell made a later similar decision in Veazie v. The Frank Herbert, decided at the June term, 1878 (No. 700), but not reported, in which case the vessel was American. The only Court of Appeals decision upon the question is to the same effect. The F. H. Stanwood, 49 Fed. 577, 1 C. C. A. 379. See The John G. Stevens, 170 U. S. 113, 119, 18 Sup. Ct. 544, 42 L. Ed. 969. I must follow the decisions in this court, and give priority to the collision claim. It may be remarked that neither the mate, cook, nor two seamen who have signed and sworn to the petition for wages have appeared to testify; that the greater part of their claims are for wages long overdue, particularly in the case of the mate and one seaman, who have been making successive voyages in the schooner since the early part of 1911; and that the only evidence in support of their claims was given by the master, who it appears is really the only person interested in the schooner, though she stands in the name of his brother. The master and all the crew live in Nova Scotia. He has collected about $500 freight, and about $450 insurance since the 1st of November, 1911. I should, in any event, hesitate to accept his unsupported testimony.

What will then remain of the fund in court must be paid to the libelant in satisfaction of his collision damages. As no defense is interposed to his libel, the decree cannot bind the owners of the Evolution beyond the fund with which I am dealing. It will, therefore, be unnecessary to determine with precision the amount which he might recover, were those owners before the court. In his original libel, sworn to November 20, 1911, the amount of damages alleged for injuries to the M. D. S., and for expenses of the master and crew, and otherwise, was $2,000. In his amended libel, sworn to by him December 1, 1911, the allegations are that the cost of the schooner's repairs, in his estimate, will be about $2,200, that she has been and will be detained by reason of them, that he was sustained other damages by reason of the expense incurred in having her surveyed, and by reason of her detention, which he estimates at about $700. The evidence which he has introduced, standing uncontradicted, would, I think, justify an assessment of these damages at nearly or quite $2,000. It will be sufficient, however, for the purposes of this case, to direct in the decree that the libelant recover the balance of the proceeds in court.

The evidence, as it stands, does not seem to me to afford the material for making any apportionment between owners and members

of the crews of the amounts awarded for salvage, and, unless it appears that such an apportionment by the court will be really necessary, the decrees may run in favor of the respective libelants generally.