**H. W. FINDLEY, Owner, Claimant, Appellant,**

v.

**Henry P. LANASA, Libelant, Appellee.**

**No. 17837.**

United States Court of Appeals
Fifth Circuit.

April 4, 1960.

---

C. R. McDonald, Jr., Otis R. Parker, Jr., Fort Pierce, Fla., Fee, Parker & Sample, Fort Pierce, Fla., for appellant.

Noah Walker, Cornelius T. Walker, Vero Beach, Fla., for appellee.

Before TUTTLE, JONES and BROWN, Circuit Judges.

Hutcheson, Circuit Judge, dissented.

Frank J. O'Connor, Miami, Fla., Wm. J. Sheridan, Jr., Balboa Heights, Canal Zone, for appellant.

Simone N. Gazan, New York City, Charles E. Ramirez, Balboa, Canal Zone, Van Siclen & Ramirez, Balboa, Canal Zone, Calvin E. Cohen, Baltimore, Md., for appellee, Henry P. Lanasa.

Before HUTCHESON, TUTTLE and BROWN, Circuit Judges.

JOHN R. BROWN, Circuit Judge.

This case deals with the problem of a maritime lien for cash advances made to a master for use in payment of crew's wages. Specifically, the narrow issue is the extent and nature of the proof required to show actual application of the funds to payment of wages. The District Court on rehearing held that a lien existed. The unsuccessful Claimant to the vessel, stating himself to be the owner but found by the District Court to be a mere non-maritime mortgagee, appeals.

There is a lot of family on both sides of this transaction involving the good ship S/S Josephine Lanasa. The successful maritime lienor (libelant below appellee here) is Henry P. Lanasa. The money advanced was delivered on the three occasions by his son, Henry M. Lanasa. On the other side of the controversy was the brother of Henry P., Vincent F. Lanasa. Vincent and George Dennis were the owners[1] of the S/S Josephine Lanasa.

■ When the case was tried, the Judge had before him the libel of Henry to impress a lien on a vessel *owned* by H. W. Findley. In that trial, Vincent Lanasa and George Dennis, either individually or through their corporation, West Indies Importing Corp., were described as and considered to be charterers. The advance being made by one brother to the master in the employ of the other for the purpose of defraying expenses for charterer's account gave the Court considerable pause. This general circumstance of suspicion was enhanced by other factors. The money was delivered for Henry by his son, Henry M. On each of these three occasions, Vincent was aboard and saw the master receive the cash from Henry M. and in turn give a signed, written receipt[2] stating that it was for crew's wages. Vincent knew, of course, that the charter party prohibited the master incurring any liens. Consistent with the general maritime law,[3]

---

1. This was through the instrumentality of their wholly owned Panamanian corporation, West Indies Importing Corp. George Dennis was the son-in-law of H. W. Findley, the Claimant, who claimed the S/S Josephine Lanasa as owner.

2. The three written receipts were typewritten with the master's named typed "Capt. Peter Penic, Master S. S. Josephine Lanasa" with his original signature signed "P. Penic." The receipts were for $2,300, $2,464, and $3,000 respectively, and each recited at the top "on

board the S. S. Josephine Lanasa." In each one payment was acknowledged by Peter Penic, Master, received from "H. P. Lanasa, USA," and stated "on account crew wages for months October & November, 1954."

3. This general approach finds frequent illustration. See, e. g., 46 U.S.C.A. § 953 under the Preferred Ship Mortgage Act which defines a "preferred maritime lien" to include " * * * (2) a lien * * * for wages of the crew of the vessel * * *." Between execution of the

the supposed charter, of course, contained the traditional exception for crew's wages and salvage. But Vincent knew that crew's wages were, as between owner and charterer, a proper charge for the account of the charterer (Vincent and George Dennis).

Viewing the matter, as he was entitled to in that state of revealed truth, the Judge looked upon the case as one based on "the theory of subrogation" in which "the captain was not the agent of the owner and * * * had no right to pledge the credit of the vessel." The Court sustained the first ground of Claimant's motion to dismiss that "the burden of proof is upon libelant to establish that he is entitled to a maritime lien by subrogation to the claims of the seaman whose wages he contends he advanced and [as to which] there is no proof that he did anything but make loans to the captain." Reflecting the significance of ownership by Findley in evaluating the sufficiency of the evidence on the purpose for the advances, the Court had this to say. "In this case the very fact that Vincent F. Lanasa, brother of the libelant and president of the charterer, was present at the delivery of the money to the captain, fully conversant with the charter's provision against pledging the credit of the vessel, makes the entire transaction subject to the sharpest scrutiny."

In this atmosphere, the District Court was apparently of the opinion that since there was no direct evidence of payment of any of these sums by the master to crew members, the decisions in The Englewood, D.C.E.D.N.Y., 1932, 57 F.2d 319, 1932 A.M.C. 343, Reconstruction Finance Corp. v. The William D. Mangold, D.C. E.D.N.Y.1951, 99 F.Supp. 651, 1951 A.M. C. 1589; and The Florine, D.C.La.1927, 1927 A.M.C. 1717, urged by Claimant, required a dismissal for insufficiency of proof.

■ But before the trial court entered a decree of dismissal upon his memorandum findings, the Libelant moved for a rehearing on the basis of newly discovered evidence. The Court granted a rehearing and on the further hearing received in the record what Libelant had described as the newly discovered evidence. Since the case was still under active consideration by the Court, the Claimant's effort here to convince us that, on principles testing the propriety of a refusal [4] to reopen a record, the granting of a rehearing was an abuse of discretion is completely unavailing.

Whether it was really newly discovered, it was certainly new to the Court. There was no abuse of discretion in granting the rehearing to receive it. Whether, after its receipt, it proved anything is quite a different matter.

mortgage and its recordation, § 924 forbids incurring "any contractual obligation creating a lien * * * other than a lien * * * for wages of the crew * *." Section 973 of the Federal Maritime Lien Act provides that "[N]othing in this chapter shall be construed to confer a lien when the furnisher knew, or by the exercise of reasonable diligence could have ascertained, that because of the terms of the charter party, agreement for sale of the vessel, or for any other reason, the person ordering the repairs, supplies, or other necessaries was without authority to bind the vessel therefor." 46 U.S.C.A. § 973. But such a prohibition is ineffective against a claim for crew's wages. The Kongo, 6 Cir., 1946, 155 F.2d 492, 1946 A.M.C. 1200, certiorari denied Standard Oil Co. of La. v. Kongo, 329 U.S. 735, 67 S.Ct. 99, 91

L.Ed. 635, 1946 A.M.C. 1496; The S. W. Somers, D.C.Md., 1927, 22 F.2d 448, 1927 A.M.C. 1753; The Chester, D.Md., 1928, 25 F.2d 908, 1928 A.M.C. 638; The President Arthur, D.C.S.D.N.Y.1928, 25 F.2d 999. The idea has never been more effectively stated than in the nautical figure of Justice Story recorded in The John G. Stevens, 1898, 170 U.S. 113, 119, 18 S.Ct. 544, 547, 42 L.Ed. 969, 972, that "seamen's wages * * * are sacred liens, and, as long as a plank of the ship remains, the sailor is entitled, against all other persons, to the proceeds as a security for his wages."

4. Claimant urges 39 Am.Jur., New Trials, § 159, "Time of Discovery; Facts known at Trial" and § 160, "Freedom from Negligence; Exercise of Diligence."

At this point, the family dealings over the S/S Josephine Lanasa became more complicated. For the newly discovered and offered evidence was the record filed in this Court in another one of her numerous legal travails from Baltimore to Texas to Florida to the Canal Zone as empty-handed suppliers sought satisfaction. Findley v. Robert C. Herd & Co., 5 Cir., 1958, 250 F.2d 77, 1958 A.M.C. 317. That record comprising testimony concerning the dealings between Findley and his son-in-law, Dennis, as well as Vincent Lanasa, the execution and exchange of various bills of sales and mortgages, was not objected to by Claimant on the ground that it was hearsay. The sole ground was that it had no bearing on the issues in the instant case.

The District Court thought otherwise, as do we. For the Court below, as had Judge Connally in the Texas case affirmed by us, now found that what he thought was the situation was something altogether different. Findley was no longer the owner whose vessel was exposed to liens incurred by a charterer through possible connivance between an easy going master and two brothers, one supplying money, the other operating the vessel as a charterer. Now the truth revealed that Findley was a mere mortgagee. A bill of sale ostensibly showed him to be the owner and he had, as such "owner" in turn chartered it back to Dennis and Vincent (or their corporation). The charter "hire," however, was stated to be the repayment of the loans previously made by Findley. The whole purpose was to put Findley in a position where he could protect himself against liens of others by virtue of the operation of the clause in the so-called charter forbidding Dennis and Vincent to incur liens. This would, so long as the fiction

were preserved, give him protection which an ordinary mortgage, as such, would not.

■ The evidence was certainly relevant on the question of the master's actual authority. For as an employee of the owner, not the charterer, he had the full authority expressed in the statute[5] to incur liens. And the attempt to put a restriction on this authority of the master as a direct employee of the owner through the lien prohibition clause in the pretended charter was ineffectual.[6]

■ It was likewise relevant on the circumstances under which the lien asserted against the vessel came into being. No longer was it the action of an agent having limited authority with some clearly defined exclusions. Now it was the act of the master as a direct agent of the owner. Moreover, the act was performed by the agent in the immediate presence, and with the unreserved consent, of the principal-owner.[7] It was then a case of funds being advanced on the owner's direct order and therefore presumptively on the credit of the vessel until the contrary was proved as the statute prescribes. Point Landing, Inc. v. Alabama Dry Dock & Shipbuilding Co., 5 Cir., 1958, 261 F.2d 861, at page 867, 1959 A.M.C. 148, 156–157.

■ Obviously, these new facts had an immediate bearing on the sufficiency of the proof as to the intended use of the funds. With the owner having direct knowledge of the advance for the stated purpose under circumstances which made the receipt by the master the admitted acts of the owner—and for his account and benefit as well—the means of knowledge concerning subsequent application of the funds was likewise in the owner's hands. Until evidence was brought for-

---

5. 46 U.S.C.A. § 972 provides: "The following persons shall be presumed to have authority from the owner to procure repairs, supplies, towage, use of dry dock or marine railway, and other necessaries for the vessel: The managing owner, ship's husband, master, or any person to whom the management of the vessel at the port of supply is intrusted. * * "

6. See 46 U.S.C.A. § 973 and note 3, supra.

7. This, of course, makes it a case within the express terms of the Maritime Lien Act as the furnishing of necessaries to a vessel "upon the order of the owner of such vessel" rather than the alternative basis of furnishing them upon the order "of a person authorized by the owner." 46 U.S.C.A. § 971.

ward by the owner to refute it, the proof offered by the lienor in this setting made out a prima facie showing.

The cases mentioned above, so strongly urged by Claimant, do not compel a contrary result. Reconstruction Finance Corp. v. The William D. Mangold, supra, was a frank appraisal of the evidence as a credibility matter. The Judge, "after observing the witnesses and considering the evidence presented," 99 F. Supp. 651, 653, simply declined to believe the testimony that $50 was really advanced for payment of crew's wages. Essentially, the same is true as to the Englewood, supra. That case does not, nor could it, undertake to declare as the legal rule what sort of evidence is required to establish use of the funds for payment of crew's wages. In the absence of the "so-called advance sheets," that Court merely declined to accept as sufficient "a general statement that a certain sum was paid * * *." 57 F.2d 319, 320. Here, as we have shown, there was much more than a general statement. Here was the act of the master in the owner's presence committing the vessel to an agreement that the funds were for crew's wages. In testing this proof, we may even assume that had the master, without the knowledge or acquiescence of the owner, subsequently misappropriated the funds, no lien would have arisen. But until that showing was made, the joint acts of master and owner were adequate to establish prima facie that the funds were used for a purpose giving rise to a maritime lien.

Findley, neither as the supposed owner nor as the mortgagee he really was, ever undertook to make any such proof. What was sufficient as prima facie proof then became uncontradicted proof and on it, the District Court was entitled to declare the existence of the lien as he did.

Affirmed.

HUTCHESON, Circuit Judge (dissenting).

Stripped of all the rhetorical involvements of the opinion, by which a pretty theory is made to answer for a legal solution, this case is a completely simple one. It presents the single question whether the claimant of a lien for moneys loaned has made sufficient proof, that they were used for crews' wages, to entitle him to a lien priming a mortgage lien. This court's espousal, however, of the district judge's conclusion on rehearing (Rec. 73) that "The discovery by the court that Vincent Lanasa was actually an owner and not a charterer, puts an entirely different complexion on the transaction" supplies *the entire absence of testimony of any person*, that the sums loaned were actually paid to the crew as wages, accepts the false logic that this discovery destroys Findley's admitted priority, as mortgagee of the vessel, over a wholly unproved claim of a lien for moneys loaned, and indeed gives the case "an entirely different complexion."

Such a decision, abstractly considered, is neither breath-taking nor earth shaking.

Unfortunately for the law, the use of this sort of chop logic or pseudo reasoning, the substitution of feeling for thinking, the ignoring of a fact for a theory, has appeared in many cases, and there is no guarantee, except the mental activity and the personality of the particular judge or judges, that it will not continue to appear.

Viewed abstractly, therefore, it might well be thought that I should not unpack my heart with words but should content myself with general reflection upon the usual futility of dissents and the particular reflection that my dissent in this case will certainly be read by few and perhaps agreed to by none but the aggrieved appellant. Of the opinion, however, that the conclusion on which the district judge and the majority have made this case turn, that on a second hearing it was shown that Findley was not owner of the vessel but the owner of a mortgage, is completely without bearing on the decision of this case, I must register my disagreement with and disapproval of the kind of reasoning which led the district judge to his opinion below and persuaded the majority to follow him.

In doing this, I wish to register particular disagreement with the statement on the last page of the majority opinion, *that the fact that the owner was present when the purported loan was made and did not protest it,* is evidence of the fact that the master *used* the funds to pay crews' wages. In the first place, there is no evidence that the owner assented at all. In the second place, the record shows only that he did not protest the loan for the stated purpose, that, indeed, *he said nothing whatever.* This fact can have no bearing on the crucial fact whether the master used the funds for crews' wages. *On this point no evidence was offered by anybody, and until such evidence was offered there was no duty upon Findley, either as the supposed owner or as the mortgagee, to make any proof on the issue.*

The final conclusion of the opinion: "What was sufficient as prima facie proof then became uncontradicted proof and on it, the District Court was entitled to declare the existence of the lien as he did."; is therefore a complete non sequitur, unsupported in fact or in law.