### GRAHAM v. OREGON R. & NAV. CO.

(District Court, S. D. New York. December 16, 1904.)

1. ADMIRALTY—JURISDICTION—MARITIME CONTRACT.

A traffic agreement between a railroad company and the owner of certain steamships, which were to be used in connection with the railroad of the first party as a part of a through line of transportation, by which agreement the parties were to co-operate in the operation of such line and divide the receipts as connecting carriers, as therein specified in detail, is not maritime in its nature, and a court of admiralty is without jurisdiction of a suit for its breach.

In Admiralty. On exceptions to libel.

Thomas D. Rambaut and J. Parker Kirlin, for libellant.
Maxwell Evarts and Robert D. Benedict, for respondent.

ADAMS, District Judge. This is a controversy which arises upon exceptions to the libel, as follows:

"I. That it appears upon the face of the libel herein that this Court is without jurisdiction of the cause of action set forth in said libel.

II. That the contract and agreement alleged in said libel is not a contract and agreement civil and maritime, and that an action of damages for the breach thereof is not within the admiralty and maritime jurisdiction of this Court."

The libel alleges as follows:

"FIRST.—The libelant, Robert A. Graham, is a resident of the State of New York, and of this District. At all the times hereinafter mentioned the respondent, the Oregon Railroad & Navigation Co., was and still is a corporation organized and existing under and by virtue of the laws of the State of Oregon, but it has property, credits and moneys in this District, to wit, in the Central Trust Company of New York, whose address is 54 Wall Street, New York City.

SECOND.—On or about October 1st, 1900, at Portland, Oregon, the libelant and the respondent, acting through its duly authorized agents, entered into an agreement by which it was agreed between the parties that the libelant should furnish steam vessels to run monthly between Portland, Oregon, and ports in China and Japan, and to carry cargoes to be furnished by the respondent in trade between points in the United States, Canada and Europe and ports of China and Japan, and that the respondent should furnish cargoes to be carried by the vessels.

It was further agreed that the steamships should be capable of carrying 4,000 tons of measurement cargo, and that the through rate of freight on the cargoes carried by steamship and railroad should be divided equally between

the libelant and the respondent, subject to certain provisions with regard to minimum payments, in certain contingencies, to both parties to the agreement.

It was further agreed that should it become necessary or advisable to accept through rates lower than a basis which should yield freight to the libelant at the rate of thirty-five cents per hundred pounds on cargo carried, such lower rates should be first agreed on between the parties to the said agreement, and after deducting from this rate such arbitraries as would be demanded by the connections of the respondent, the balance of the said rate should be pro-rated in the proportion of fifty cents to the respondent and thirty-five cents to the libelant.

It was further agreed that if it should become necessary, in order to meet the competition of another transportation line, the minimum rate accruing to the libelant on certain specific kinds of the cargo might be reduced by the respondent to the rate of twenty-five cents per hundred pounds.

It was further agreed that all traffic between the Pacific Coast and Asiatic ports, should be for the sole benefit of the libelant, and that the libelant should, wherever possible, forward such cargoes by the railroad of the respondent, or by the railroad or steamship lines controlled by the respondent, at rates to be agreed on, but not to exceed 25% of the through rate, according to the steamship freight list, and with a specified minimum payment to the respondent or its connections.

It was further agreed that the respondent should assist the libelant in obtaining low rates between Pacific Coast points on cargo handled at Portland, to or from connecting lines, and that on cargo from which the respondent received no benefit, the libelant should pay to the respondent the actual cost of labor service at Portland, not in excess of twenty-five cents per ton.

It was further agreed that on cargo of not less than carload lots of 24,000 pounds gross weight or 25 tons of forty cubic feet measurement, from Asiatic ports to points on the respondent's line between Portland and Omaha, the libelant might issue through bills of lading at the current rate of freight on similar goods to parallel points on competing lines, but that for cargo in less than carload lots to points above mentioned the libelant should not issue bills of lading beyond Portland, and the respondent should have the right to charge thereon its local rate of freight from Portland to destination.

It was further agreed that the libelant should have exclusive right to appoint agents in Asiatic ports who should be duly authorized to act as agents for both parties to the agreement, and to have power to issue bills of lading and passenger tickets and to make and name freight on all traffic to points in the United States, Canada and Europe, subject to certain provisions in the agreement as to rates of freight, and subject also to certain provisions in the agreement which permitted the respondent to establish through its agents in the United States, Canada and Europe, rates on traffic for Asiatic points.

It was further agreed that the libelant should have the right, if it should be deemed advisable, or necessary, to appoint, at its own expense, agents in Portland, Oregon, and/or Victoria, British Columbia, for the management of the steamships at the port of call, and to procure traffic from the Pacific Coast, and for the purpose of assisting and advising the respondent in all matters pertaining to the steamship service, and it was also agreed that the libelant should have the right, should it be deemed advisable or necessary, to appoint an agent at its own expense, in New York, whose duty should be to assist in procuring traffic for the steamships of the libelant, and who should be under the control of the respondent in regard thereto.

It was also agreed that subject to the above mentioned exceptions the respondent should have the exclusive right to appoint agents in all points in the United States, Canada and Europe, who were thereby authorized by the libelant to act as his agents, also, and these agents were to have authority to issue through bills of lading and passenger tickets, and establish rates on all traffic for Asiatic points served by the libelant's steamships.

It was also agreed that the respondent should pay to the agents of the libelant a commission of five per cent. on its earnings on all Asiatic traffic procured by them, and that the libelant should pay to the respondent for its

agents five per cent. on his earnings on all traffic for Asiatic ports, obtained by the agents of the respondent.

It was also agreed that on the arrival of the vessels at Portland, the cargo carried should be tallied out by officers of the steamship in conjunction with officials of the respondent, and that damaged packages should be set aside, and for claims thereon the libelant should be responsible, and it was also agreed that the respondent should give a receipt for all cargo received at Portland, and the responsibility of the libelant as to cargo to be carried over the lines of the respondent should cease on correct delivery at Portland.

It was also agreed that on cargo destined for Asiatic ports and delivered to the libelant's steamships at Portland a tally should be kept by the officers of the steamship, in conjunction with officials of the respondent, and that damaged packages should be set aside, and for claims thereon the respondent should be responsible. It was also agreed that the steamship officials should give a receipt for all cargo taken on board at Portland, and that such receipt should absolve the respondent from further responsibility as to the cargo included therein.

It was also agreed that the respondent should do all it could to assist the libelant in obtaining quick despatch in discharging and loading the steamships at Portland, and to assist in making contracts for coal, provisions and labor required by the vessels, and to authorize and permit the respondent's agents everywhere actively to solicit all and any traffic that might be required for the return voyages of the steamships to Japan and China.

It was also agreed that the respondent should provide wharfage on all traffic passing over the railroads of the respondent, and that on cargo to or from Portland locally, and Asiatic points, the respondent might make a charge to the shippers or consignees of twenty-five cents per ton per steamship's freight list.

It was further agreed that the respondent should render to the agent of the libelant, at Portland, within two weeks after the departure of the steamship from Portland, or sooner, if possible, an account showing the earnings of the steamship, inwards and outwards, on that voyage and that the balance should be paid at once by the party owing, and it was further agreed that each round trip, inwards and outwards, should be kept separate.

It was further agreed that the aforesaid contract between the parties should be binding on both parties for the term of three years from October 1, 1900, but that the libelant should have the option of withdrawing his steamships and terminating the agreement at the end of the second year, or at the end of each succeeding second year, on giving to the respondent one year's notice, in writing, of his intention to withdraw his vessels, and to terminate the agreement.

It was also agreed that the respondent might call for arbitration to determine its right to cancel contracts on giving one year's notice to the libelant of its desire to do so, provided the Steamship Line should not be kept up to the standard that would permit of its being fairly worked in competition with other trans-Pacific lines.

It was also agreed that any disputes arising out of the terms of this agreement should be settled by arbitration, one arbitrator to be selected by each party, and the two so selected to choose a third, the decision of a majority of the arbitrators to be final and conclusive on the parties thereto.

A statement of the terms of the aforesaid agreement between the libelant and the respondent is hereto annexed, marked 'Appendix A,' and made a part of this libel.

THIRD.—Thereafter, pursuant to the terms of the aforesaid agreement between the libelant and the respondent, the libelant furnished to the respondent five steamers, capable of carrying 4,000 tons of measurement cargo, for the establishment of a steamship service between Portland, Oregon, and ports in China and Japan, to be operated in connection with the respondent's railroad, and cargoes were furnished for the said steamships by the respondent, in pursuance of said agreement, for several months thereafter, and until about the 10th of April, 1901, and in doing so delivered, under joint bills of lading, cargoes and merchandise from its railway cars to the libelant at Portland for transportation by his said line of steamships, and received at

said port cargoes from said steamships which had been brought from Asiatic ports and transported the same to their destination over the said railroad and its connections, and also paid and received commissions on earnings on said traffic and conferred and co-operated with the libelant in preparing joint bills of lading, in arranging for voyages of the said steamships, in advertising for traffic, in employing competent agents and in soliciting business. The name of the line under which the steamers were operated, in pursuance of the agreement between the parties, was the Oregon & Oriental Steamship Company.

FOURTH.—Subsequently to the date of the aforesaid agreement between the libelant and the respondent, of October 1st, 1900, the libelant expended large sums of money in connection with the carrying out of the terms of the aforesaid agreement between the libelant and the respondent; in providing and chartering vessels for the service; in renting offices; employing agents and servants; advertising sailings; endeavoring to obtain business; in making such alterations and changes in the arrangement and equipment of the steamships as was reasonably deemed necessary for the carrying out of the purposes of the aforesaid agreement between the parties; in altering and repairing docks and providing coal for the steamships, and generally in doing things suitable and necessary for the proper carrying out of the terms of the aforesaid agreement between the libelant and the respondent, according to its true intent and meaning.

FIFTH.—Thereafter and on or about March 9th, 1901, the respondent wrongfully and improperly, by a notice in writing, signed by its duly authorized agent and representative therefor, notified the libelant that it would wholly abandon, on its part, the performance of the aforesaid agreement, and cancel the contract theretofore existing between the libelant and the respondent, at the expiration of thirty days from that date, and on or about the tenth day of April, 1901, and subsequently thereto, and ever since that date, the respondent has wrongfully and improperly refused and failed to carry out its part of the aforesaid agreement of October 1, 1900, between the libelant and the respondent, by refusing to furnish or deliver eastbound cargoes to the steamers at Portland, by refusing to permit libelant to engage westbound cargoes for shipment over respondent's railroad, under through bills of lading, or for through rates in pursuance of the contract; by preventing libelant's steamships from docking at its dock in Portland, Oregon; by establishing and operating a rival steamship line in the same service, and for the purposes covered by the agreement with the libelant, and generally by wrongfully and improperly refusing to carry out the obligations resting on it under and by virtue of the aforesaid agreement between the libelant and the respondent.

SIXTH.—The libelant has duly performed all the obligations resting on him under and pursuant to the aforesaid agreement between the libelant and the respondent. The respondent has not carried out the obligations resting on it under and pursuant to the aforesaid agreement between it and the libelant, but in violation of the terms of the aforesaid agreement the respondent, during the time that it was furnishing cargoes to the steamships, which the libelant furnished under the aforesaid agreement, itself established and operated a line of steamships for trade between the Pacific Coast and Asiatic ports; during the same period, and in violation of the terms of the aforesaid agreement between it and the libelant, the respondent wrongfully and improperly sent an agent to Asiatic ports, where the libelant's steamships had previously obtained cargoes, and there issued circulars to shippers of trans-Pacific freight and otherwise advised the public that the traffic agreement between the libelant and the respondent would be withdrawn early in the spring of 1901, and that the libelant could not furnish through bills of lading for cargo from Asiatic ports to points in the Eastern States of the United States; and generally in violation of the terms of the said agreement between it and the libelant, the respondent took measures and performed acts with the intent, on its part, and the natural and probable consequences of which were to deprive the libelant of the benefits accruing to him under and by virtue of the aforesaid agreement between him and the respondent. During the period covered by the aforesaid agreement between the libelant and

the respondent, and throughout the period since October 1, 1900, the respondent had cargoes at Portland, Oregon, for Asiatic ports, and these cargoes were sent forward by steamers chartered, or operated by the respondent, or by a subsidiary company, or corporation, acting in agreement with the respondent or as its representatives and agents, and these cargoes were not furnished to nor sent forward on the libelant's vessels. During the same period there were cargoes at Asiatic ports that could have been obtained by the libelant for transportation on his vessels to Portland, Oregon, and thence to points in the Eastern States of the United States, under the terms and conditions of the aforesaid agreement with the respondent, and these cargoes could have been carried by the libelant on his vessels with profit, but the libelant was prevented from obtaining the cargoes, or issuing through bills of lading therefor, as had been agreed, by the acts of the respondent and its servants and agents hereinbefore referred to, and by the refusal of the respondent to perform its part of the agreement between it and the libelant of October 1, 1900.

SEVENTH.—By reason of the premises the respondent has become liable to pay to the libelant the damages resulting to him by reason of the failure of the respondent to carry out the terms of the aforesaid agreement between the libelant and the respondent. These damages, so far as they can reasonably be measured and ascertained, amount to the sum of $683,931.00, and consist of expenses incurred in the establishment, equipment, maintenance and operation of the said steamship line; in the charter hire paid by the libelant to the owners of the said steamships; in the liability incurred by the libelant to the owners of the said vessels, by reason of the charter parties necessarily and reasonably made by the libelant of vessels for the purpose of carrying out the terms of the agreement between the libelant and the respondent; of expenses incurred in refitting and altering the said steamships so as properly to carry out the purposes of the said agreement between the libelant and the respondent; the expenses incurred in repairing and improving docking facilities in Asiatic ports which were necessary, reasonable and proper for the carrying out of the purposes of the aforesaid agreement between the libelant and the respondent, and of the reasonable profits that directly and proximately would have accrued to the libelant if the respondent had carried out on his part the duties and obligations resting on it under and by virtue of the aforesaid agreement between it and the libelant.

EIGHTH.—Subsequently to the 9th day of March, 1901, and after the receipt by the libelant of the above-mentioned notice from the respondent that thirty days from that date the respondent would decline to carry out the terms of the agreement between it and the libelant, the libelant sought to arbitrate with the respondent in Oregon, and subsequently in the City of New York, where the libelant had been referred by the duly constituted agent and representative of the respondent in Oregon, the difference in dispute that had arisen between the libelant and the respondent as to whether or not the respondent had the right to refuse to carry out its part of the aforesaid agreement. The respondent at New York, by its duly authorized agent and representative, requested the libelant to submit to the respondent his papers relating to his claim, and thereafter the libelant did deliver to the respondent's agent and representative at New York certain papers relating to the libelant's claim against the respondent, including the aforesaid written notice from the respondent to the libelant of March 9, 1901. Subsequently thereto the respondent wholly refused and declined to arbitrate the matters in dispute between it and the libelant, and although duly required and requested by the libelant to return to him all the papers he had submitted to it, has wrongfully and improperly refused and failed to do so.

NINTH.—All and singular the premises of this libel are true and within the admiralty and maritime jurisdiction of the United States and of this Honorable Court."

The agreement mentioned was as follows:

"APPENDIX A.

MEMORANDUM OF AGREEMENT made and entered into at Portland, Oregon, United States of America, this first (1st) day of October, 1900, between the

Oregon Railroad & Navigation Company, first party, and R. A. Graham, second party.

That whereas, the second party desires to establish a line of steamships between Hong Kong and the ports of China and Japan, and the City of Portland, Oregon, United States of America, said steamships to be suitable for the intended trade between the ports of China and Japan, and other Asiatic ports, and points in the United States of America and Canada and Europe; and

Whereas, the first party is engaged in operating a railroad in the northern portion of the United States of America, and is desirous of forming an alliance for the purpose of controlling passenger and freight traffic and other business between the above-mentioned points,

Now, therefore, it is hereby mutually covenanted and agreed between the parties hereto as follows:

1. ESTABLISHMENT OF STEAMSHIP LINE.

(A.) The second party shall procure, establish, and commence to run a monthly line of steamships between Hong Kong and the ports of China and Japan and the port of Portland, Oregon, within one month from the date hereof. Said steamships shall be capable of carrying four thousand (4,000) tons of measurement cargo.

(B.) The second party shall have the right, should there be insufficient traffic offering during the slack season (January to April, inclusive), to run one steamship every two months in place of monthly.

(C.) If the traffic offered shall increase so that it is practicable to run more steamers than provided for by this agreement, either by shortening schedule time or running extra steamers, the second party shall supply them.

(D.) The second party shall have the right, should it be deemed advisable or become expedient in order to meet competition, to call at Honolulu in Victoria, B. C., on the voyage to and from Portland, Oregon, and also to send its steamships on to San Francisco after leaving Portland on the inward voyage, returning to Portland before leaving upon the outward trip.

2. DIVISION OF THROUGH RATES ON OVERLAND CARGO.

(A.) The through rate by steamship and rail shall be divided equally between the parties hereto, provided that:

(B.) The first party shall receive a minimum of seventy-five (75) cents per hundred (100) pounds to and from points east of Chicago, which are ordinarily termed Eastern Common points and which include in the main: New York, Troy, Albany, Schenectady, Buffalo (New York); Boston, Fitchburg, Gloucester, Lawrence, Salem, Springfield, Worcester (Mass); Hartford, New Haven (Conn.); Baltimore (Md.); Philadelphia, Harrisburg, Pittsburg (Penn.); Cleveland, Cincinnati, Toledo (Ohio); Indianapolis (Ind.); Detroit, Port Huron (Mich.); Paterson (N. J.); Concord, Manchester, Nashua (N. H.); Providence (R. I.); New Orleans (La.); Memphis (Tenn.); Toronto, Brockville, Kingston, Ottawa, Cornwall, Hamilton, London, Prescott (Ontario); Montreal, Quebec (Que.).

(C.) The first party shall receive a minimum of fifty (50) cents per hundred (100) pounds to and from points ordinarily termed Western Common points, and which include in the main: Chicago (Ill.); Minneapolis, St. Paul, Duluth (Minn.); Omaha (Neb.); Council Bluffs, Sioux City, Dubuque, Keokuk (Iowa); Leavenworth, Atchison (Kansas); Kansas City, St. Joseph, St. Louis (Mo.); Milwaukee (Wis.); Winnipeg (Man.).

(D.) Any reduction in the through rate from the above basis shall be borne by the second party until the minimum accruing to the steamships shall reach thirty-five (35) cents per hundred (100) pounds. Should it become necessary or advisable to accept through rates lower than on above basis, such lower rates shall first be agreed upon between the two parties hereto, and after deducting from the agreed through rate such arbitraries as are demanded by the connections of the first party, the balance of the through rate shall be pro-rated in the proportion of: to the first party fifty (50) cents, and to the second party thirty-five (35) cents.

(E.) Should it become necessary in order to meet the competition of the Canadian Pacific Railway and Steamship Line, or other competing lines in

the transportation of raw cotton or cotton piece goods (Domestics) destined to Asiatic ports, the first party is hereby authorized to reduce the minimum accruing to the second party to a basis of twenty-five (25) cents per hundred pounds to meet such competition.

(F.) On raw silk and silk piece goods and other valuable cargo requiring equal to passenger train service, there shall first be deducted from the through rate one dollar ($1.00) per hundred pounds to be allowed the first party for such expedited service and the remainder of the through rate to be divided as provided in Article 2nd, and paragraphs A. and B.

**3. Traffic (Cargo and Passenger) Between Asiatic and Pacific Coast Ports.**

(A.) All traffic between the Pacific Coast and Asiatic ports shall be for the sole benefit of the second party.

(B.) The second party wherever possible shall forward such cargo by the Railroad of the first party, or by the railroad or steamship lines controlled by the first party, at rates to be agreed on, which shall not exceed twenty-five (25) per cent. of the through rate per steamship freight list, and with a minimum to the first party or its connections of one dollar ($1.00) gold per ton per steamship freight list.

(C.) The first party shall assist the second party in obtaining low rates between Portland and other Pacific Coast points on cargo handled at Portland to or from connecting lines.

(D.) On cargo from which the first party receives no benefit the second party will pay to the first party the actual cost of labor service at Portland, which shall not exceed twenty-five (25) cents per ton.

**4. Asiatic Cargo to Western Local Points.**

(A.) For cargo in not less than carload lots of 24,000 lbs. gross weight or tons measurement (25) of forty (40) cubic feet, from Asiatic ports to points on the line of the first party between Portland, and Omaha, the second party may issue through bills of lading at the current rate of freight on similar goods to parallel points on competing lines.

(B.) For cargo in less than carload lots to the local points above mentioned the second party shall not issue bills of lading beyond Portland and the first party shall have the right to charge thereon its local rate from Portland to destination.

**5. Agencies.**

(A.) The second party shall have the exclusive right to appoint agents in Asiatic ports, who shall be duly authorized to act as agents for both parties hereto and who shall have power to issue bills of lading and passenger tickets and to make and name rates on all traffic to points in the United States, Canada and Europe, subject to clauses two and five (2) and (5).

(B.) The second party shall have the right, should it be deemed advisable or necessary, to appoint, at its own expense, agents in Portland, Oregon, and/or Victoria, B. C., for the Management of the steamships at the port of call and to procure traffic from the Pacific Coast and for the purpose of assisting and advising the first party in all matters pertaining to the steamship service.

(C.) The second party shall have the right, should it be deemed advisable or necessary, to appoint an agent at its own expense, in New York, United States of America, whose duties shall be to assist in procuring traffic for the steamships of the second party and who shall be under the control of the first party as regards thereto.

(D.) The first party shall have the exclusive right, with the exception above (Paragraphs 'B' and 'C') to appoint agents in all points of the United States, Canada and Europe, and the second party hereby authorizes the first party and its appointed agents to act as agents for the second party and to issue bills of lading and passenger tickets and to make and name rates on all traffic for the Asiatic points served by the steamships of the second party, subject to clause two (2).

**6. Commission to Agents as Remuneration for Procuring Traffic.**

The first party shall pay the agents of the second party a commission of five (5) per cent. on its earnings on all Asiatic traffic procured by them; and

the second party shall pay the first party for its agents a consideration of five (5) per cent. on its earnings on all traffic for Asiatic ports obtained by the agents of the first party.

### 7. TALLYING OF CARGO.

(A.) On arrival of the steamships at Portland, the cargo shall be carefully tallied out by the officers of the steamships in conjunction with the officials of the first party—all damaged packages shall be set aside and a full and correct list thereof made, and for claims on such damaged packages the second party shall and hereby agrees to be responsible. The first party shall give to the steamship a receipt for all cargo received at Portland and as regards cargo to be carried over the lines of the first party, the responsibility of the second party shall cease, on correct delivery at Portland.

(B.) On cargo destined for Asiatic ports and delivered to the steamships at Portland, a careful tally shall be kept by the officers of the steamship in conjunction with the officials of the first party. All damaged packages shall be set aside and a full and correct list thereof made—and for claims on such damaged packages the first party shall and hereby agrees to be responsible. The steamship officers shall give a receipt for all cargo taken on board at Portland which shall absolve the first party from all further responsibility.

### 8. QUICK DISPATCH OF VESSELS—COALS, &C.—RETURN CARGOES.

The first party agrees to do all it can to assist the second party in obtaining quick dispatch in discharging and loading its steamships at Portland to assist in making contracts for coal, provisions and labor required by its vessels; and authorize and permit its agents everywhere (saving as specified in clause 6, paragraphs 'B' and 'C') to actively solicit all and any traffic that may be required for the return voyages of the steamships to Japan and China.

### 9. WHARFAGE.

(A.) First party agrees to provide wharfage at Portland free of expense to the second party on all traffic passing over the railroads of the first party.

(B.) On the cargo to or from Portland locally and Asiatic points, the first party may make a charge to the shippers or consignees of twenty-five cents per ton per steamship's freight list.

### 10. COST OF ADVERTISING—TELEGRAPHING—STATIONERY.

The cost of stationery (printing forms, etc.) and of advertising and telegraphing in and from China and Japan shall be the expense of the second party, and the cost for like services in and from the United States shall be borne by the first party, provided such advertising and telegraphing is done with its consent.

### 11. ACCOUNTS.

(A.) The first party shall render to the agent of the second party at Portland within two weeks after the departure of the steamship from Portland, or sooner if possible, an account showing the earnings of the steamship inwards and outwards on that voyage and the balance shall be paid at once by the party owing. Each round trip (inwards and outwards) shall be kept separate; accounts for passenger traffic shall be settled through the general office at Portland, as promptly as possible.

(B.) An account for commissions due to the agent of the parties hereto under clause 7, shall be made by the first party as promptly as practicable after the steamers' departure from Portland, and the same shall be paid at once by the party owing.

(C.) All accounts shall be rendered in triplicate.

### 12. ALLIANCE WITH OTHER LINES.

During the period of this agreement the second party shall not enter into an alliance with any other transcontinental railway company, and the first party shall not form an alliance with any other Asiatic steamship line to or from Portland.

### 13. DETENTION OF STEAMSHIPS.

Unavoidable delay arising from breakdown or loss of the steamships or from excessive bad weather shall not be deemed a breach of this contract.

**14. TRANSFER OF CONTRACT.**

Either party shall have authority to transfer this contract to another responsible firm or company with the consent of the other party.

**15. DURATION OF AGREEMENT.**

(A.) This agreement shall be binding on both parties for the term of three (3) years from the date hereof; but the second party shall have the option of withdrawing its steamships and of terminating this agreement at the end of the second year or at the end of each succeeding second year of the above period, provided the second party gives to the first party one year's notice in writing of its intention to withdraw his steamships and to terminate this agreement.

(B.) The first party may call for arbitration to determine its right to cancel contracts upon giving one year's notice of its desire to do so, provided that the line is not kept up to the standard that will permit of its being fairly worked in competition with other trans-Pacific lines.

**16. INTERSTATE COMMERCE LAW.**

Nothing in this agreement shall be permitted to conflict with the provisions of the Interstate Commerce Act, a law passed by the Government of the United States. It is, therefore, agreed and understood that this agreement shall be at all times subservient to the requirements of that law and shall be modified arbitrarily to conform with its provisions should it become necessary to do so.

**17. SETTLEMENT BY ARBITRATION.**

Any disputes arising out of the terms of this agreement shall be settled by arbitration. One arbitrator to be selected by each party and the two so selected to choose a third, the decision of a majority of the arbitrators to be final and conclusive by the parties hereto.

In witness whereof, these presents have been executed by the parties hereto."

The cause of action stated in the libel is based upon the breach of a contract alleged to have been made between the parties. This contract is referred to in the complaint at the end of the second paragraph, as follows:

"A statement of the terms of the aforesaid agreement between the libelant and the respondent is hereto annexed, marked 'Appendix A' and made a part of this libel."

In support of the jurisdiction, it is contended that the libel does not aver that Appendix A constitutes the entire agreement between the parties and, furthermore, that there is no conflict between the averments of the libel and the provisions of the contract, referred to in Exhibit A, the former being merely a fuller statement of the effect and import of what was embodied substantially and in general terms in the contract referred to.

There are a great many provisions in the contract which admittedly are not maritime but that is immaterial. If the contract is maritime, the admiralty will proceed to enquire into all its breaches, and all the damages suffered thereby, however peculiar they may be and whatever issue they may involve. The Electron (D. C.) 48 Fed. 689.

It is necessary, however, that the main contract should be maritime. An examination of the agreement as averred and contained in Exhibit A, shows it to be a traffic agreement which could as well have been made between two railroads in the pursuit of their ordinary business of furnishing transportation upon land, to which a carriage by water is often an incident but a minor one. Here the parties have described the arrangement desired by the railroad company an "alliance for the purpose of controlling passenger and freight traffic and other business"

between certain points and on the part of the libellant "to establish a line of steamships between Hong Kong and the ports of China and Japan and the City of Portland, Oregon" (fols. 65–67). The agreement there provides for a division of through rates, with an arrangement for a reduction of rates to meet competition, for the appointment of agents in Asiatic ports for both parties and for their own agents in particular places, and for the payment of the agents and other expenses of the enterprise, generally by the parties themselves, but all on land. Under the rule adverted to, supra, all these seem to be minor matters and the jurisdiction must be determined by a proper answer to the question, was the contract itself a maritime one, that is, the main contract, which provided for an arrangement between the parties for the establishment of a steamship line, in connection with the operation of a railroad. A somewhat similar question was passed upon in The Yankee Blade, Vandewater v. Mills, 19 How. 82, 15 L. Ed. 554, where the contract provided:

" 'This agreement, made this twenty-fourth day of September, 1853, at the city of New York, between Edward Mills, as agent for owners of steamship Uncle Sam, and William H. Brown, as agent for the owners of steamship America, witnesseth, that said Mills and Brown hereby agree with each other, as agents for the owners of said ships before named, to run the two ships in connection for one voyage, on terms as follows, viz.:

'Of all moneys received from passengers, and for freight contracted through, between New York and San Francisco, both ways, the Uncle Sam shall receive seventy-five per cent., and the America shall receive twenty-five per cent. The money to be received here, by said E. Mills, and the share of the America to be paid over to William H. Brown, or to his order (before the sailing of the ship,) and the share due the America, of moneys received on the Pacific side, to be paid over to said Brown, or to his order, immediately on the arrival of the passengers in New York, by E. Mills, who guaranties, as agent aforesaid, the true and honest return of all funds received by his agents on the Pacific. It is understood that this trip is to be made by the Uncle Sam, leaving San Francisco on or about the 15th of October, and the America leaving New York on or about the 20th of October next.

'Each ship is to pay all expenses of her running and outfits, and to be responsible for her own acts in every respect. Each ship is to retain all the money received for local freight or passengers; that is, for such freight and passengers as only pay to the ports the individual ship runs to, without any division with the other ship.

'No commissions are to be charged anywhere on any receipts for the America, by said Mills, in division, but the expense of advertising and the amount paid out for runners, at all points, are to be borne by each ship in the same proportion as receipts are divided between them.

'In consideration of all the above well and truly performed in good faith, Edward Mills, as agent for the steamship Yankee Blade, hereby agrees, that when the America arrives at Panama, on her voyage hence for the Pacific ocean, said ship Yankee Blade shall leave New York at such time as to connect with the America, conveying passengers and freight on the same terms as is hereinbefore agreed, (say 25 per cent. to the Yankee Blade, and 75 per cent. to the America.) Provided, only, that said connection shall be made at a time that will not prevent the Yankee Blade from making her connection with the Uncle Sam, at her regular time.' "

Mr. Justice Grier, in delivering the opinion of the court, said: (pages 91, 92, 19 How., 15 L. Ed. 554).

"Now, by this agreement, the libellant has not hired the Yankee Blade, or any portion of the vessel; nor have the master or owners of the ship covenanted to convey any merchandise for the libellant, nor has he agreed to

furnish them any.. But the agent for the Yankee Blade 'agrees that when the America arrives at Panama, the Yankee Blade shall leave New York, conveying passengers and freight,' which were afterwards to be received by the America, and transported to San Francisco; the passage money and freight earned was to be divided between them—25 per cent. to the Yankee Blade, and 75 to the America.

This is nothing more than an agreement for a special and limited partnership in the business of transporting freight and passengers between New York and San Francisco, and the mere fact that the transportation is by sea, and not by land, will not be sufficient to give the court of admiralty jurisdiction of an action for a breach of the contract. It is not one of those to which the peculiar principles or remedies given by the maritime law have any special application, and is the fit subject for the jurisdiction of the common-law courts."

The libellant contends that The Yankee Blade is practically overruled by Insurance Company v. Dunham, 11 Wall. 1, 20 L. Ed. 90. The question there determined was that the admiralty courts had jurisdiction to entertain a libel *in personam* on a policy of marine insurance to recover for a loss. But The Yankee Blade is found cited, though not on the question of jurisdiction, in several recent cases, viz.: in 1892, in The J. E. Rumbell, 148 U. S. 1, 9, 13 Sup. Ct. 498, 37 L. Ed. 345; in 1896, in The Glide, 167 U. S. 606, 612, 17 Sup. Ct. 930, 42 L. Ed. 296; in 1897, in The John G. Stevens, 170 U. S. 113, 117, 18 Sup. Ct. 544, 42 L. Ed. 969, and evidently is regarded by the Supreme Court as authoritative. It seems to me to be binding upon the question of maritime jurisdiction of this court.

It is urged by the libellant that the libel contains the allegation "that the respondent should furnish cargoes to be carried by the vessels" which makes the case one of admiralty jurisdiction. The difficulty with the contention is, that, as shown above, the libel contains the averment that the contract, as found in Appendix A "is a statement of the terms of the agreement." That being alleged, and admitted by the exceptions, there is no room for an inconsistent allegation, which possibly might extend the libel to cover an admiralty cause of action. Reading the libel as a whole, it seems to allege that the contract relied upon is found in Appendix A. If that is not so, it should, if the facts permit, be differently alleged.

The exceptions must be sustained, but with leave to the libellant to amend within twenty days.