## GRAHAM v. OREGON R. & NAV. CO.

(District Court, S. D. New York. April 9, 1906.)

CONTRACTS—EVIDENCE TO ESTABLISH—ACTION FOR BREACH.

Evidence considered, and *held* not to establish a contract between libelant and respondent to operate libelant's steamships and respondent's railroad as a through line of transportation for goods between oriental ports and

points in the United States, for the breach of which libelant sued, but to show that, while there were negotiations looking to such a contract and a temporary agreement was made for interchange of traffic between the parties, the contract for a definite term claimed was never consummated.

In Admiralty. Suit for breach of contract. On final hearing.

Thomas D. Rambaut and J. Parker Kirlin, for libellant.
R. D. Benedict and Maxwell Evarts, for respondent.

ADAMS, District Judge. This action was brought by Robert A. Graham against The Oregon Railroad and Navigation Company to recover the damages alleged to have been sustained by him by reason of the breach of an agreement made on or about October 1st, 1900, at Portland, Oregon, for the furnishing by the libellant of steam vessels to run monthly between Portland and ports in China and Japan and to carry cargoes to be furnished by the respondent in trade between points in the United States, Canada and Europe and the said ports in the Orient. The matter has been before the court several times, on the question of jurisdiction (134 Fed. 454; 135 Fed. 608), and of the authority of the court to allow an amendment, where an exception to the jurisdiction is sustained (134 Fed. 692). The libels were set forth at length in those decisions and it is unnecessary to re-state the claims here. Briefly, the libellant claims that a contract for 3 years was made and the breach of it, involving damages to him of $683,931. The respondent again urges the lack of jurisdiction and denies that any such agreement as claimed was made but alleges that in the summer and fall of 1900, it was arranging to put on a steamship line of its own to cover the points and until that arrangement was perfected, it exchanged freights with the steamships of the libellant temporarily on a basis of the division of the through rates, it being understood that the libellant was not to cut rates, and further alleges that an agreement was drawn by Mr. Campbell, the traffic manager of the respondent, for submission to and approval by the president and directors of the respondent, covering the terms of the proposed temporary arrangement. The respondent further alleges that in March, 1901, the libellant notified the respondent that he was going to send his steamships to San Francisco, and in the meantime would make certain rates of freight, which was a cutting of rates, and that thereupon the respondent rightfully ceased to have any further dealings with him.

The question of jurisdiction has again been argued at great length, and the respondent urges three other points, viz.: that Mr. Campbell, the traffic manager of the respondent, had no authority to execute the contract alleged by the libellant and that there was no ratification of it by the respondent; that the contract which the libellant alleges was made by Mr. Campbell was never made, and if such contract had been made, the action of the libellant in cutting rates was a breach of it.

The question of jurisdiction is an important one and it is very doubtful if the libellant has by the testimony brought himself within the amendment to the libel, which was allowed upon the allegation that the negotiations culminated in an agreement, which referred to Appendix A as a memorandum incidental to the main contract. In the original

libel Appendix A was alleged as a statement of the terms of the agreement, but in the amended libel it was alleged that such Appendix, instead of being a statement of the terms of the agreement was subsidiary thereto and merely incidental. It was held that the new allegation made the alleged agreement a maritime one within the authorities and therefore within the jurisdiction of the court ([C. C.] 135 Fed. 611). The case, as made by the evidence, seems to show such a state of affairs as made the contract one not within the jurisdiction of court under the authority first cited in the matter (134 Fed. 462-464), but it is not necessary to determine the case upon this question, as its presentation has put before the court the testimony in full and I have thereby become convinced that upon the merits the libellant has not made out a case upon which recovery should be allowed. The contro- versy upon the question of jurisdiction, however, has furnished a part of the material upon which a conclusion is reached that the contract which the libellant alleges was made with Mr. Campbell was not in fact ever made. This conclusion dispenses with the necessity of considering the other points raised by the respondent.

Some of the considerations which have led me to the conclusion, apart from my impressions on the trial from the bearing of the witnesses, which were decidedly favorable to the respondent, are as follows:

The libellant has put himself in a false position with respect to the claimed agreement. When he verified the original libel, he swore that Exhibit A was the agreement. When it was held that the original libel would not sustain a claim of jurisdiction of this court, he swore that Exhibit A was merely incidental to another agreement, which set forth a maritime cause of action. When he testified in court he said several times that Exhibit A was the agreement upon which he based his right of recovery.

It appears that the respondent had a contract for its Orient business with the Northern Pacific Steamship Company, operating from Tacoma, dated August 28th, 1897. It expired by its terms in 3 years, that is August 28th, 1900, but was extended for thirty days by mutual consent. This was executed for the Steamship Company by George B. Dodwell, for himself and partners, and was therefore known as the Dodwell contract. When this contract was about expiring, there were negotiations between the libellant and Mr. Campbell respecting the Oriental business. The libellant had some steamers at his disposal and desiring to make a contract to replace the expiring contract, he called upon Mr. Campbell and broached the topic. There is a strong dispute as to what took place, the libellant contending that a 3 years' contract was the subject of negotiation and Mr. Campbell that his company at the time was about arranging for a line of its own and would do no more than make a temporary arrangement for the interchange of business and allow the libellant the same rates his company had to pay in the Dodwell contract. There were a number of interviews in September and October, at one of which a Mr. Creighton was present. He was to represent the libellant in the Orient, in the management of his business there and testified strongly in his favor. It is urged by the

libellant that the fact of Creighton giving up a remunerative position, as he testified he did, and going to China was inconsistent with any other understanding on Creighton's part than that the libellant had a 3 years' contract, but it is almost as consistent with an understanding that the libellant intended to establish a line of his own to the Orient for the period of 3 years and the expectation that he would get a contract for that time with the respondent. Creighton knew that the contract had not been executed when he left for China, although it was necessary that it should be signed by the president of the respondent to make it valid and binding. He knew that some officer of the respondent, at least, should sign it, if not the president, nevertheless he went away with the knowledge that it was not executed by any one on the part of the respondent. After reaching China, be cabled to the libellant, on the 26th or 27th of November: "What information have you of permanent exclusive arrangement—railway. I must know—Mail not yet arrived." To this, the libellant cabled November 29th: "* * * Have permanent exclusive arrangement." There was in fact, nothing in the way of such an agreement existing at the time. Creighton was still unsatisfied and he cabled on the 1st of December directly to Campbell asking for a message that he was "authorized to contract east bound shipments" in connection with the respondent. This cable was not produced but is mentioned in a telegram from Campbell to Miller, the assistant general freight agent of the respondent, dated December 3rd, 1900, as follows:

"Portland, December 3, 1900.

B. Campbell, Care Auditorium Annex, Chicago, Ill.

Graham's representative anxious to know if decision been reached relative to interchange of west-bound traffic and whether he is authorized to solicit such traffic. Creighton cables asking for message from you representing he is authorized to contract east-bound shipments in connection with our line.

R. B. Miller."

Campbell's reply to Miller was as follows:

"Chicago, Dec. 4, 1900.

R. B. Miller, A. G. F. A. O. R. & N. Co., Portland, Or.

Conference with Graham not contemplate our company having and connection with agencies unable to grant Creighton's request. If particular shipment west bound in sight to move before my return wire and will authorize on it.

B. Campbell."

Exhibit M was not produced and put in evidence but there was satisfactory evidence of the receipt of such a communication from Creighton in view of the fact that there is nothing said by Creighton with reference thereto, nor by the libellant denying that he knew of Campbell receiving such a cable and communicating it to Miller, I think it may be safely concluded that it was sent and received. The telegram of Miller, with the reply of Campbell, tends to show that as late as December 4th, the parties understood that no agreement had been made but was merely in contemplation.

The conduct of the respondent is opposed to the idea that a contract for any definite time had been made.

It was engaged in the employment of steamers to supply a line of its

own and actually chartered two steamers in New York, the Indrapura and the Indravelli, some time in November, 1900. They reached Portland in March or possibly later.

Campbell testified that, at the libellant's request, he formulated a memorandum such as he, the witness, could recommend and submit to the President of the respondent, Mr. Mohler, for approval and execution. The memorandum was sent to Mr. Cotton, the counsel of the respondent, on the 12th of November, for the purpose of having an agreement prepared on the suggested lines. In view of such action, it is not credible that any agreement already existed with the libellant. It is not conceivable that such action would have been taken simply for the purpose of making evidence, and the action of Campbell is not reconcilable with the existence of the contract claimed by the libellant, on any other theory.

Mr. Mohler, after testifying to the Dodwell agreement, said that the respondent had made plans to establish an independent line of steamships and commenced in May, 1900, to negotiate for ships and that in November, 1900, the first chartering was made through the New York office; that the libellant called upon him twice in the fall of 1900, and asked if the contract could not be hurried up and Mohler replied that the matter was in the hands of the law department and he could take no action until it came to him. His attention was called to several conversations the libellant testified took place between them and he said the libellant's account of them was absolutely untrue.

Mr. Cotton, who was secretary and general attorney of the respondent, testified that he had some conversation with the libellant in Salem, Oregon, with reference to a contract but he had in mind a form of contract which Campbell had sent to him and he, the witness, told the libellant that he would take it up as soon as he could get to it, after his business with the Legislature in Salem was through. The libellant's contention was that Exhibit 3, which he said contained the contract agreed upon, was merely being copied. This witness said that was not true, the fact being that he was preparing a contract on the lines furnished him by Campbell.

In November, the libellant was using the steamship Eva. Miller telegraphed to Campbell then in Chicago, on the 27th:

"'Eva' about ready to sail from other side. Has cargo for eastern points. Graham's representative desires to know if we will take it on basis proposed agreement, otherwise will make different arrangements and wishes to cable Hong Kong at once. Please advise."

To this Campbell replied the 28th:

"We will take Eva's cargo on basis terms proposed agreement."

These telegrams were called to the libellant's attention by a letter to him from Miller, dated November 28th. In addition to showing the respondent's view of the situation, all the circumstances tend to demonstrate that the libellant then knew that the respondent did not recognize any thing more than a proposed agreement. It is not perceived how he could believe at that time that there was a binding contract which had been in force from the 1st of October. The fact that he admits he asked

Campbell to sign the contract and the latter replied it would have to be signed by Mohler, shows his understanding of the matter.

The libellant says he asked Mohler to sign the contract, which is inconsistent with the existence of any contract. He also asked Cotton for a signed contract and must have known in its absence that none existed. All the circumstances hereinbefore indicated are entirely inconsistent with the libellant's present claim.

There is much in the testimony to indicate that the libellant hoped, and possibly expected, to get the contract he now insists was made, but nothing of much force to show that he believed it was actually consummated. He was corresponding with Campbell in March, 1901, respecting business for his steamers but nothing to indicate that any contract existed. He claims the great improbability of his diverting two steamers then in his employ from profitable business and chartering a number of steamers for a contract that he only expected. He urges that at the time of his first arrival in Portland, he had two steamers under charter, the Eva and the Universe, and subsequently chartered three more, the Adata, the Carmarthenshire and the Monmouthshire. It is disputed that he lost any profitable use of his ships, but however that may be, his conduct does not satisfactorily prove anything more than that he was willing to incur risks for the sake of establishing a supposedly remunerative business. By reason of not obtaining the contract, he doubtless lost some money and failed to make much more than he expected to, but it is not apparent how the respondent is liable for such result. The respondent did give him employment for his vessels for a time and would have continued to do so for a part of them, but under conditions which did not suit him. It is said by the respondent that he did not live up to his temporary contract respecting rates but cut them in violation of the compact. That question has been suggested but has not been considered by me for the reason that the conclusion reached that there was no such contract as the libellant claimed is decisive of the case.

After the dismissal of his vessels in Portland, the libellant came to New York to get into communication with the head and principal owner of the respondent's line. There has been considerable argument on both sides with respect to what then took place, which included a proposition on the libellant's part for a settlement, but I do not deem it necessary to discuss the events, as I do not think they have much, if any, bearing upon the final disposition of the case.

Rulings on the motions with respect to testimony under depositions are indicated on the briefs. Orders should be submitted thereon.

Libel dismissed.