**AIPLE TOWING CO., INC.**
v.
**MV TRI-W in rem.**
**Civ. A. No. 74-948.**

United States District Court,
E. D. Louisiana.

May 13, 1975.

William K. Johnson, Lord, Bissell & Brook, Chicago, Ill., Arthur Crais, Lawrence E. Abbott, James G. Burke, Jr., Burke & Ballard, New Orleans, La., for plaintiff.

Charles E. Lugenbuhl, Robert C. Leininger, Jr., New Orleans, La., for defendant.

ALVIN B. RUBIN, District Judge:

The sole issue remaining in this case is the determination of damages; the parties have stipulated liability to the extent of eighty per cent of the actual damages found.

Aiple, the plaintiff, was the bareboat charterer and owner pro hac vice of a hopper river barge. The barge, carrying a cargo of soybeans, was being towed to New Orleans by defendant's tug, when it sank as a result of negligence of the tug's personnel. The cargo was lost near Memphis on April 3, 1974, at 8:00 p. m., after the close of the grain markets that day. The barge would have arrived in New Orleans on Saturday, April 6, a non-trading day on the grain market. Aiple paid $275,-944.50 to the consignee of the cargo, Midwestern Grain. This figure was based on the closing price of May soybean futures on the Chicago Board of

Trade on April 4, the day after the barge sank, plus a trading basis of 10 cents per bushel:

| | |
|---|---|
| Price per bushel | $5.685 |
| Trading basis | +.10 |
| | 5.785 |
| | x47,700 bushels |
| | $275,944.50 Total |

The parties agree that the tower is liable but they do not agree that $275,-944.50 represents the value of the soybeans.

The price of the commodity fluctuated from day to day and from place to place, so the date on which and the place where value is to be determined are crucial. At the time when the cargo was lost, the price of soybean futures was dropping by 20 cents per bushel each day, so every day by which determination is set back would reduce the measure of damage.

■ Under COGSA, 46 U.S.C.A. §§ 1300–1315, in a suit for breach of a contract to carry cargo, damages are fixed by looking to the market price at the port of destination on the day of arrival. St. Johns N. F. Shipping Corp. v. S. A. Companhia Geral, etc., 1923, 263 U.S. 119, 125, 44 S.Ct. 30, 31, 68 L.Ed. 201, 1923 A.M.C. 1131; The Ansaldo San Giorgio I v. Rheinstrom Bros. Co., 1935, 294 U.S. 494, 55 S.Ct. 483, 79 L.Ed. 1016, 1935 A.M.C. 419. See Gilmore & Black, The Law of Admiralty, 2d ed. 1975, 188–89. This formula follows naturally from the concept that breach of contract is the liability imposing event, for the carrier's basic obligation is to deliver the cargo in good order and the aim of contract remedies is to put the injured party in the position he would have been in if the other party had fully performed. See Gilmore & Black, The Law of Admiralty, 2d ed. 1975, 139–40; Uniform Commercial Code § 1–106.

■■ But the duty of the tower is governed by tort, not contract, principles. The John G. Stevens, 1898, 170 U.S. 113, 18 S.Ct. 544, 42 L.Ed. 969. Hence the claim here against the tower is for negligence, not breach of contract to deliver cargo. The tort principle of compensation is that property lost or destroyed is to be valued at the time and place of loss. Ozanic v. United States, 2 Cir. 1948, 165 F.2d 738; 2 Harper & James, The Law of Torts 1310 (1956).

■ Here the place of loss was Memphis, and the time of loss was after the markets closed on April 3rd and before they opened on the 4th. As Aiple points out, two hypothetical businessmen in Memphis closing a sale for cash on April 4 could only base that sale on April 4 figures; April 5 figures would not then be available. Aiple paid on the basis of the later date, with its lower market close, so we use April 4th in preference to the 3rd. There is no evidence of any actual, organized market at Memphis on April 4th. To find the equivalent of a Memphis market price, we can take the New Orleans market price for that date, and reduce it by the towage from Memphis to New Orleans, a total of $900.

■ Midwestern Grain Company, the consignee of the cargo, was trading at 10 cents over May on April 4, and at 10½ cents over May on April 5, 1974. This is the price adjustment actually made by Aiple, and it determined the loss Aiple actually suffered. It may be true that Continental Grain Company, a major competitor in the market, was trading at 6½ cents per bushel over the May future price for soybeans on April 4, 1974, and 8 cents over May on April 5, 1974. But the issue is the loss Aiple suffered; that is determined by what it paid Midwestern unless it paid more than was due. What Midwestern was due is determined by its sale price, not its competitor's.

■ The parties also differ on the quantity and quality of the soybeans. Quantity must be determined in order to calculate the total loss; quality is important because price adjustments are usually made to reflect quality.

The soybeans were loaded at Farmer's Soybean in Barfield, Arkansas, after weighing in on an unofficial scale, at 47,-

700 bushels or 2,862,000 lbs. (1431 tons). The bill of lading issued showed this quantity and weight. A cargo weight of 1431 tons will submerge Barge ACO-52 to a draft of approximately 8' 10". Farmers Soybean took draft readings of 9 feet at all 4 corners of the barge, and these draft readings thus confirm the weight claimed.

The cargo's weight was not accurately determined at the time of loading; the cargo was to be weighed officially, and the price determined, by weight at New Orleans.

Tri-W argues that there is evidence that the claimed weight was not accurate and that the shortage must be deducted. It estimates the shortage by comparing the actual weight at destination of cargo in ten barges loaded at the Farmers Soybean facility immediately before and after the sinking of the barge with the estimated amount loaded. These figures show an average shortage of 797.68 bushels per barge load. This average shortage, Tri-W submits, should be deducted from the stated loaded amount of 47,700 bushels to ascertain more accurately the amount of soybeans actually aboard the Barge ACO–52 at the time of her sinking: 46,902.32 bushels. A computation based on 47,000 bushels would seem to be fair, based on this evidence. The fact that the soybeans were never officially weighed was of course the result of defendant's negligence, Empresa Central etc. v. Republic of Brazil, S.D.N.Y., 1957, 147 F.Supp. 778, 781, aff'd 257 F.2d 947, but the evidence, fairly considered, indicates that the weight was likely somewhat short of the Barfield estimate.

The parties differ also on the quality of the lost cargo. It is clear that some quality discount is required. When the soybeans were loaded, the moisture reading was "13.5% or under." The contract provided for a 2½ cent per bushel discount if the moisture range were 13.0% to 13.5%. Aiple admits that the value of the soybeans is to be reduced 2½ cents per bushel.

Tri-W speculates that the soybeans may have been otherwise inferior. Soybeans are traded on the Chicago Board of Trade at the theoretical grade of Number 1 soybeans, and the contract here called for No. 1 grade. When the actual purchase is confirmed and a grain inspection is performed, various discounts are subtracted from the agreed per bushel price for variances in the quality of the grain actually delivered. Here the parties departed from the commercially accepted practice of using seller's grade at origin to determine the actual per bushel price. No inspection was performed at the point of origin, and the destination grade was to govern the sale.

Variances in factors affecting the quality of soybeans sold reduce the purchase price, and the amount of the reduction depends on the degree of the variance. Test weight (the tested pounds per bushel), moisture content, split grain, damaged grain and heat damage all, within certain limits, will affect the per bushel purchase price. In addition, there is a "dockage" factor for foreign material: all foreign material in excess of one percent is deducted from the gross weight.

▇ Because no analysis of the lost cargo was made at the point of origin, the actual quality of the soybeans will never be known. The cargo on the barge loaded just before the one that sank was subject to a quality discount of 6 cents and the barge that was loaded just after the one that sank was subject to a quality discount of 4½ cents. In addition, quantities on these two barges were reduced 2.5% because of foreign material found in the soybeans. In all probability, the quality of the soybeans on the middle barge was no better than the better of the other two. Accordingly I will allow a per bushel quality discount of 4½ cents and a quantity discount of 2.5%.

▇ The final disputed claim is for loss of use of the barge. It sank on April 3; repairs were completed on May

21. Aiple claims for loss of use of the barge from the time of her sinking until the time that the repairs were completed, at a rate of $183.00 per day, or a total of $8,770.00. This is the amount for which Aiple invoiced Tri-W, and it is based on the Aiple demurrage schedules then in effect.

The only testimony concerning the claim for loss of use was by deposition, and the witness used the contractual demurrage schedule in effect at the time of the casualty between Aiple and its various customers. There was no showing during the course of that deposition that Aiple actually lost any profits because of the loss of use. The court will take judicial notice that the loss occurred in the spring of the year when the upper Mississippi River had just opened and barges are usually busy. On the other hand, had the loss not taken place, the barge would have spent some time in the Port of New Orleans being discharged and would have been returned empty to Minnesota for cleaning. An allowance of $183 per day for 30 days appears equitable. See Parks, Law of Tug, Tow and Pilotage 427–34 (1971). See also Continental Oil Company v. SS ELECTRA, 5th Cir. 1970, 431 F.2d 391; Delta Marine Drilling v. M/V BAROID RANGER, 5th Cir. 1972, 454 F.2d 128.

Thus, damages are computed as follows:

### CONCEDED ITEMS

| | | |
|---|---|---:|
| 1. | Towage of barge to St. Louis following refloating | $ 399.00 |
| 2. | Shifting of barge while awaiting repairs | 68.50 |
| 3. | Placing barge into position for repairs | 165.00 |
| 4. | Moving barge from gas free plant to fleeting area | 55.00 |
| 5. | Moving barge from fleeting area to repair facility | 55.00 |
| 6. | Cleaning and repairing barge | 13,662.37 |
| 7. | Salvaging and refloating barge | 16,091.00 |
| 8. | Moving barge to upbound tow after refloating | 175.00 |
| 9. | Surveys | 2,727.30 |
| 10. | Diving services | 2,069.00 |
| | | $35,467.47 |

### ITEMS ALLOWED BY COURT

1. Loss of Use
$183 per day
x30 days
$5,490

2. Cargo Loss

$5.685 base price per bushel
+.100 trading basis
−.450 quality discount
$5.335 net price per bushel

47,000 bushels loaded
−1,255 foreign matter fee (.025 x 47,000)
45,745 net bushels

45,745 x $5.335 = $244,049.58
−900.00 transport to N.O.

$243,149.58 Total cargo loss award