538 F.Supp. 65 (1982)
CONSOLIDATED GRAIN AND BARGE COMPANY, Plaintiff,
v.
FLOWERS TRANSPORTATION, INC., Defendant.
No. 79-692 C(3).
United States District Court, E. D. Missouri, E. D.
March 31, 1982.
*66 Husch, Eppenberger, Donohue, Elson & Cornfield, Alan B. Hoffman, Joseph P. Conran, St. Louis, Mo., for plaintiff.
Thompson & Mitchell, Raymond L. Massey, St. Louis, Mo., Ernest Lane, III, Greenville, Miss., for defendant.

MEMORANDUM
FILIPPINE, District Judge.
This matter is before the Court for a decision on the merits of plaintiff's complaint, following trial to the Court. The complaint seeks recovery of $78,050.56 for damages to plaintiff's barge OPT 286 and its cargo, which were allegedly caused by defendant's employees who towed plaintiff's barge. The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1333. After consideration of the parties' detailed stipulations of fact, the testimony and exhibits introduced at the trial of this matter and by stipulation, the parties's briefs and the applicable law, the Court enters the present memorandum opinion, which it adopts as its findings of fact and conclusions of law.
*67 Plaintiff, Consolidated Grain and Barge Company ("Consolidated"), is a corporation organized and existing under the laws of the State of Missouri, with its principal place of business located in St. Louis, Missouri. At all times relevant to this action Consolidated has been the owner of the Barge OPT 286 (the "barge"), an unmanned, unpowered steel hulled barge.
Defendant, Flowers Transportation, Inc. ("Flowers"), is a corporation organized and existing under the laws of the State of Mississippi, with its principal place of business located in Greenville, Mississippi, engaged in the business of transportation and shipping on the inland waterways of the United States, including the Mississippi River within the boundaries of the Eastern District of Missouri.
The barge is an all steel, welded hopper barge, equipped with steel rolling covers, and divided by four transverse bulkheads into a raked bow, a square stern and three wing tanks, port and starboard. These eight tanks are known collectively as the void tanks. The dimensions of the barge are 195 feet in length by 35 feet in breadth by 11 feet in depth. The barge has 3 foot coamings and when empty has 9½ feet of freeboard. It was built by Nashville Bridge Company at Nashville, Tennessee and was 21 years old at the time of the incident herein, having been built in 1957.
Access to the void tanks of the barge is provided by hatches located at the forward end of each wing tank and at the center of the bow and stern tanks. These hatches turn and lock at deck. The three wing tanks on each side of the barge are referred to by number, starting with number one at the bow.
The void tanks surround an inner cargo compartment known as the hopper. The hopper bottom is 24 inches above the barge hull, and its sides are three feet three inches inside the sides of the barge. It has eight covers, numbered from the bow to the stern. The coamings and the cargo covers extend above the decks for a combined distance of 6½ feet. The full load cargo capacity of the barge is 1,618 tons.
The usual and customary service of the barge prior to the incident alleged herein was transportation of grain to New Orleans southbound and transportation of salt and fertilizer northbound to grain loading points.
On April 7, 1977, the following repair was performed to the cargo hopper of the barge: "Cut hole in cargo box over # 1 compartment, shingle hole, then weld box over same, weld plate back in cargo box. Also weld hole made by crane bucket."
On December 14, 1977 the barge was inspected by Louisiana Marine Service at the Upper St. Rose Fleet. The inspection showed, inter alia, 14 inches of water in one of the number one wing tanks. However, the hopper was "not sighted" during this inspection.
On December 15, 1977 Zito Metcalfe Marine Repairs checked all wing tanks for water, inspected the bow and stern tanks, and pumped 18 inches of water from the number one wing tank. Zito Metcalfe Marine Repairs was unable to locate any leaks. Between December 16 and December 28, 1977, Louisiana Dock Co., Inc., performed repairs to the barge.
On January 2, 1978 the barge was loaded with a cargo of 1,391.08 tons of bulk di-ammonium phospate ("DAP") at Luling, Louisiana, consigned to USS Agri-Chemicals at North Bend Terminal, Cincinnati, Ohio, pursuant to Consolidated's Bill of Lading No. 32, dated January 2, 1978. The bill of lading specified that the cargo was to be insured by plaintiff as carrier, and the cargo was so insured. The bill of lading contained the provision that "Any carrier or party liable on account of loss of or damage to any of said property shall have the full benefit of any insurance that may have been effected upon or on account of said property, so far as this shall not avoid the policies or contracts of insurance: Provided, that the carrier reimburse the claimant for the premium paid thereon."
Towing service for the voyage was arranged by Consolidated with Flowers. The barge was taken in tow by Flowers on *68 January 7, 1978 by the M/V J. Russell Flowers, a towboat owned and operated by Flowers, at approximately mile 106 on the lower Mississippi River. The barge was thereafter towed by the M/V J. Russell Flowers northbound on the lower Mississippi River to Hickman, Kentucky, where it arrived on January 17, 1978 at 8:00 p. m. From January 7 to January 13 the barge was located somewhere in the middle of the tow; from January 14 until arrival at Hickman, the barge was the lead port barge.
On January 19, 1978, between 5:00 p. m. and midnight, the barge was taken in the tow of the M/V Col. George Lambert, a towboat operated by Flowers under charter, at Hickman Harbor Service, at approximately mile 922 on the lower Mississippi River. Hickman Harbor Service was not owned or operated by Flowers at that time.
The George Lambert and its tow, including the barge, entered the Ohio River and proceeded northbound on the Ohio River to the vicinity of the Markland Lock and Dam, where it arrived on January 25, 1978 at approximately 6:15 a. m. On January 20, the barge was the second barge out from the boat in the port string. From January 21 until arrival near Markland Lock and Dam, the barge was in the center string, second barge out from the boat, with three barges ahead of it.
Under the defendant's own instructions to its employees, all barges were to be checked for water by inspecting their void tanks when the barges were picked up and before they were dropped off. The evidence established that prevailing industry practice is to inspect in that manner, but that there is no prevailing practice regarding such inspection in the interim between pick-up and drop-off. In general, under normal conditions, unless the towing crew has some special reason to watch for water in a barge, an experienced crew can adequately observe if a barge is taking on water by walking the decks and looking for any signs of listing or unusual rigging tension. However, both plaintiff's witness Captain Ralph Clark and defendant's witness Robert Collins testified that the tanks should be inspected visually every three days or so, at least (according to Collins) in normal weather.
The preponderance of the evidence thus establishes that the exercise of due care requires visual inspection of the void tanks when a barge is picked up. Due care also requires inspection of the void tanks every three or four days thereafter, especially, Collins' qualification notwithstanding, if ice or snow has accumulated on a tow, which renders external observation ineffective. The evidence also established that due care requires that a barge be pumped of water at least by the time the water level in the void tanks reaches twelve inches, which would be twelve inches below the hopper floor in plaintiff's barge.
The evidence is inconclusive as to whether or not the void tanks of the barge were inspected for water when the barge was dropped off by the J. Russell Flowers and picked up by the George Lambert at Hickman. However, the evidence did establish that while en route up the Ohio River from Hickman to the vicinity of the Markland Lock and Dam, the crew of the George Lambert was checking the void tanks of the barges that could be reached easily. There was severe winter weather at this time, and all the barges were covered with snow and ice.
On January 25, 1978, at approximately 6:15 a. m., the George Lambert and its tow, including the plaintiff's barge, tied off at approximately mile 540, below the Markland Lock and Dam, and remained so tied off until approximately 3:20 p. m. on February 3, 1978. During this period the Markland Locks were closed to navigation due to an ice gorge which had formed on the Ohio River above the dam. Plaintiff's barge remained in the tow as the second barge out from the George Lambert in the center string. The tow was never moved during this period.
During the period February 1-4, the Master's log of the George Lambert does not reflect that any barges in the tow, including the plaintiff's barge, were found to be listing. Nor does the Master's log of the *69 George Lambert reflect any groundings or collisions or indicate that any problems in the navigation of the barge were experienced by the wheelhouse personnel of the vessel.
While the tow of the George Lambert was tied off below Markland, the weather continued to be snowy and rainy. The barges built up a cover of ice and snow of 1½ to 2 feet, and snowdrifts on the couplings were even higher. The evidence indicates that some but not all of the barges were checked for water in their void compartments during this period, and that the crew mainly stayed inside the boat during this period. At this time there were 14 barges in the George Lambert's tow, and each barge had 8 to 10 void tank hatches. It would have required as much as several days for the George Lambert's crew to clear away the ice and snow to check each void tank.
On February 3, 1978, at approximately 3:20 p. m., the George Lambert received orders from Flowers to depart southbound on the Ohio River with its tow. The George Lambert topped its tow around and departed southbound at approximately 4:30 p. m. At approximately 10:30 p. m. the boat and tow arrived in the vicinity of the McAlpine Lock and Dam at Louisville Kentucky.
The George Lambert and its tow passed through the McAlpine Lock shortly after midnight on February 4, 1978, and at approximately 1:10 a. m. on February 4, arrived at the McBride Fleet, located near mile 613 on the Ohio River, and began making drops and pickups.
At approximately 8:00 a. m. on the morning of February 4, 1978, as plaintiff's barge was being taken out of tow at McBride's Fleet, its stern began to sink. The crew brought four pumps to the barge, and began to pump water out. The stern deck was under 6 inches of water when pumping began. The barge had a slight list as it went down. After pumping had continued for several hours, the barge was broken completely out of tow and was moved over to the bank.
At approximately 3:00 p. m. on February 4, 1978, a crane provided by the McBride Fleet began unloading cargo from the barge into empty barge ET452.
William P. Kellum, an independent marine surveyor, was contacted by Flowers and requested to proceed to the McBride Fleet as Flowers' representative in the matter. Kellum arrived at the fleet at approximately 4:00 p. m. on February 4, 1978, at which time he observed that approximately 80 tons of cargo had already been removed from the barge and transferred to the barge ET452. Kellum observed wet cargo at the point of discharge under the number 7 cargo cover of the barge (the second cover from the stern) and observed that three to five buckets containing partially wetted cargo had been transferred into the ET452. He also observed a minimum of ten inches of ice and snow on the tow of the Geroge Lambert.
According to Kellum's survey report, the water level at the time of his arrival was at deck level, and water marks on the coamings indicated that the water had been 2 feet above the deck. All wing tanks and the stern tank had to be pumped. By 8:00 p. m., the void compartments had been freed of water, and sufficient freeboard had been achieved that pumping and cargo transfer were stopped, awaiting a telegram releasing Flowers of responsibility for the barge and cargo, and acceptance by the McBride Fleet.
Kellum proceeded to enter all the compartments of the barge and to inspect them for damage. Kellum found a ¼ inch hole in the starboard side plate (or outer hull) of the number one wing tank, which he shingled. He also found a leak or leaks in a previously patched area in the starboard hopper wall adjacent to the third wing tank. The leak(s) were just above the hopper floor. Water was dripping out of this area into the wing tank.
The George Lambert stood by until the barge was accepted by the Fleet at approximately 9:00 a. m. on February 5, 1978. The George Lambert departed the McBride Fleet at 10:00 a. m. on February 5, 1978.
*70 At the request of Richard Yeomans of Louisiana Marine Service and for the account of Consolidated, Claude E. Moore, an independent marine surveyor, proceeded to the McBride Fleet, arriving on February 6, 1978. He opened the cargo covers and observed wet cargo under the number 7 cargo cover.
The McBride Fleet's crane was moved to Louisville Harbor for another job on February 6. Due to a breakdown and to weather conditions, the crane did not return to McBride's Fleet until March 14, 1982.
During the period from 10:00 p. m. on February 4 through the departure of Consolidated's surveyor Moore on February 6, 1978, the barge did not appear to Kellum or Moore to be leaking or to be in danger of sinking. Neither Kellum nor Moore observed any change in this condition through March 16, 1978, when unloading of cargo was completed.
On March 13, 1978 Claude Moore returned to the Fleet. Late on March 14, 1978, the crane arrived at the Fleet, and on March 15, 1978 a portion of the cargo was off-loaded into the barge ET452. On March 16, 1978 offloading of dry cargo into the ET452 continued, and was completed at approximately 7:30 p. m. At that time Claude Moore estimated that there were 300 tons of water damaged cargo remaining in the barge. A period of six weeks (February 4March 16, 1978), elapsed from the commencement of dry cargo offloading until completion. However, the evidence is that no further damage occurred to the cargo between the dates offloading commenced and was completed.
On April 2, 1978, at the request of Richard Yeomans, the remaining cargo in plaintiff's barge was inspected by Jan Haynes. Haynes concluded that the cargo was damaged beyond use.
The cargo offloaded onto barge ET452 from plaintiff's barge totalled 1,100.74 tons. USS Agri-Chemicals, the consignee of the cargo, accepted 575.63 tons of the ET452 shipment. The remainder of the ET452 load was exchanged with DAP from another company, The Andersons. Agri-Chemicals claimed $41,527.49 from plaintiff for its loss of 301.47 tons, and plaintiff paid the claim. In addition, The Andersons claimed $4,930.63 in damages from cargo it took in exchange from plaintiff that ultimately was rejected; plaintiff paid $3,471.95 of this claim.
Of the remaining cargo on board the OPT286, which was not shipped to North Bend, 49 tons were sold for salvage at $42 per ton to L D Bunting & Company of Decatur, Illinois, realizing a recovery on salvage of $2,061.99.
On May 4, 1978, the barge was drydocked at Walker Boatyard in Pakucah, Kentucky, at which time it was surveyed by Claude Moore and Dudley Yeomans for Consolidated and William Kellum on behalf of Flowers. Moore observed damages of "an apparent recent nature" in the side and bottom hull plating, including a hole in the bottom of number three wing tank. He also noted "miscellaneous fractures" in the covers. (The dimensions of the holes in the bottom plating of the barge expressed in Moore's survey report No. 2247-78, conducted May 4, 1978, refer to the size of the patches that were used to repair the holes, and not to the holes themselves.)
Moore noted no damages to the barge at any relevant time which would evidence a connection between any observed hull damage, including gashes, ruptures or fractures, and the entry of water into the cargo hopper which caused the damage for which claim is asserted herein.
Repairs were performed on the barge while it was on drydock in May, 1978. Among these repairs was "vee and weld 7'11" of fractures inside the cargo hopper."
The statement contained in both Moore surveys that the barge had been damaged when it struck a submerged object in the Louisville harbor while in the downbound tow of the George Lambert is not contended by plaintiff to be a cause of the loss alleged herein.
Moore could not express an opinion as to how the water got into the cargo box, although he did not believe it could have *71 resulted from the leak in the hopper sideplate observed by Kellum on February 5. According to Richard Yeomans, however, the water in the cargo hopper must have come in from the wing tanks through cracks in the hopper; plaintiff's witness Captain Ralph Clark testified that water must have been entering the void tanks for several days before February 4, and that the water damage to the cargo could have occurred over a number of days by water entering the leaking area observed by Kellum.
The Court finds that the preponderance of the evidence is that the damage to the cargo was caused by the entry of water, through the hopper leak(s) observed by Kellum, from the wing compartments. The Court further finds that the barge was taking on water for a period of several days prior to February 4. This fact apparently went unobserved by the crew of the George Lambert. Although walking the decks to check for listing of barges might have been a sufficient method of checking for water under normal conditions, it was not sufficient when snow and ice had accumulated on the barges and the couplings, and, in the case of plaintiff's barge, when it was rigged to eight other barges. The only method of ascertaining the fact that plaintiff's barge was taking on water, under these conditions, would have been to look into the void tanks. This obviously was not done, at least not frequently enough. If the void tanks of plaintiff's barge had been checked for water every third day or so, the damage to the cargo undoubtedly could have been averted.
The defendant's liability to the plaintiff is not that of an insurer or of a common carrier; defendant's duty was "to exercise such reasonable care and maritime skill as prudent navigators employ for the performance of similar service." Stevens v. The White City, 285 U.S. 195, 202, 52 S.Ct. 347, 349, 76 L.Ed. 699 (1932). The burden is on the plaintiff to show that its loss was caused by defendant's breach of that duty, and no presumption of fault is raised merely because plaintiff's barge (or cargo) was delivered to defendant in good condition and was returned to plaintiff in damaged condition. Id. However, a plaintiff need not prove every particular of the incident which caused its loss, and hence, for example, a plaintiff may be entitled to an inference of negligence by showing that a grounding has occurred, even though the plaintiff is not able to establish the circumstances under which the grounding occurred. Mid-America Transportation Co., Inc. v. National Marine Service, Inc., 497 F.2d 776 (8th Cir. 1974), later appeal 526 F.2d 629 (8th Cir. 1975), cert. denied 425 U.S. 937, 96 S.Ct. 1671, 48 L.Ed.2d 179 (1976).
The Court concludes that plaintiff has established by the preponderance of the evidence that the crew of the George Lambert did not exercise the reasonable care in checking its tow for water that a prudent tug crew would have exercised. Under the weather conditions prevailing from January 19 to February 4, it would undoubtedly have been an onerous task for the crew to check each void tank of each barge for water. Yet those same weather conditions rendered the crew's "walk the deck" inspections insufficient for determining whether barges were taking on water. The defendant is not claiming an act of God as a defense, and it has not been shown that it would have been impossible for the crew of the George Lambert to check each void tank every three days.
In reaching this conclusion, the Court declines to rely on the supposed fact that, as testified by Noah Adkins, Allen Meyers, First Mate of the George Lambert, said he had been told when plaintiff's barge was picked up at Hickman that the barge was a "slow leaker." Adkins' depo. at 17. While Meyers' statement is not hearsay under Fed.R.Ev. 801(d)(2)(D), Adkins' deposition in general does not make particularly persuasive reading. Moreover, Meyers could not recall having been told anything about the condition of plaintiff's barge. The Court does not consider decisive the fact that Meyers was or was not told that the barge was a slow leaker. This was something *72 that the crew would have discovered for itself, had it used due care.
Defendant contends that the evidence shows that the plaintiff's barge was unseaworthy and uncargoworthy when it was picked up by defendant, although not obviously so, and hence that defendant is absolved from any liability for the damage caused by such unseaworthiness or uncargoworthiness. See, e.g., South, Inc. v. Moran Towing and Transportation Co., 360 F.2d 1002 (2d Cir. 1966). The evidence is that the barge was inspected on December 15, 1977, and no leaks were found. Repairs were performed on the barge just five days before it was loaded with DAP on January 2, 1978. The presumption of unseaworthiness, that arises when a vessel is lost and there is no proof of mishandling of the vessel, arises when the weather is fair and the water calm. South, Inc., supra. In the instant case the evidence was that the damage to the barge observed on May 4, 1978, could have been caused by the ice it encountered in January and February of 1978.
Even assuming that the damage was caused to the barge before it was picked up by the M/V Russell Flowers on January 7, 1978, or in the period from January 17 to 19, when the barge was at Hickman Harbor Service, that would not alter the fact, as found above, that the exercise of due care entailed a visual inspection of the void tanks of each barge when it was picked up and every three days or so thereafter under the weather conditions then prevailing. While a detailed inspection may not have been required, Massman Construction Co. v. Sioux City & New Orleans Barge Lines, 462 F.Supp. 1362 (E.D.Mo.1979), the fact is that a visual inspection was required. The fact that there were leaks in the cargo hopper does not relieve defendant of liability for its negligence. First Mississippi Corp. v. Fielder Towing Co., 469 F.Supp. 1080, 1085 (N.D. Miss.1979); cf. Mid-America Transportation Co. v. Gladders Towing Co., 492 F.Supp. 475 (E.D.Mo.1980) (defendant, whose crew had periodically pumped water from a void compartment of the plaintiff's barge in its tow, was not responsible for water damage to the cargo). Therefore, as to the condition of the cargo, plaintiff has proved a specific item of negligence on the part of the George Lambert's crew which was the proximate cause of plaintiff's damage.
However, the Court concludes that plaintiff has not sufficiently established that the damage to the barge, as opposed to the damage to the cargo, was the result of negligence on defendant's part. Defendant was not a bailee, and the mere fact that the barge may have been in good condition when delivered to defendant but not in good condition on February 4, 1978 when inspected by Kellum, or on May 4, 1978, when inspected by Moore, does not establish defendant's negligence. Stevens v. The White City, supra. Plaintiff's witness Ralph Clark, who had read the depositions and discovery in this case, and reviewed the log sheets, testified that nothing he had read indicated that defendant was responsible for the damage repaired by Walker Boat Yard, as reflected on plaintiff's exhibit 40. No specific act of negligence in the handling of plaintiff's barge which could have caused the barge damage has been proven by plaintiff. Under the circumstances, plaintiff has not sufficiently proven that damage to the barge, as opposed to damage to the cargo, was attributable to defendant's negligence. Stevens v. The White City, supra; Mid-America Transportation Co. v. Gladders Towing Co., supra.
Turning to a consideration of damages, the Court faces the preliminary issue of the effect of the "benefit of insurance" clause contained in the bill of lading, as set out above. The evidence is that on February 1, 1979, plaintiff received the sum of $53,044.16 as an interest-free loan from Allstate Insurance Co., repayable solely out of any recovery for damage to the cargo in plaintiff's barge. Plaintiff's exhibit 59. Defendant contends that the benefit of insurance clause thus relieves it from liability for cargo damage, as payment has been made. The policy of insurance has not been introduced into evidence, and the Court cannot determine whether the benefit of insurance clause, if applied to defendant, would avoid any provision in the policy.
*73 Even if the defendant should be considered the donee beneficiary of the provision of the bill of lading, to which it was not a party, cf. Willamette-Western Corporation v. Columbia Pacific Towing Co., 466 F.2d 1390 (9th Cir. 1972) (temporary crane charterer was a donee beneficiary of the insurance policy on the crane, obtained by the usual charterer, which waived subrogation against "charterers"), but see The Pillsbury Co. v. Delta Boat & Barge Rental, Inc., 1980 AMC 2323, 2326-27 (E.D.La.1979) (towing company not a "party liable" within the meaning of the benefit of insurance clause) (alternative holding), the loan of the type which plaintiff received from its insurer has been held not to constitute payment which extinguishes the liability of the third party. Luckenbach v. W. J. McCahan Sugar Refining Co., 248 U.S. 139, 39 S.Ct. 53, 63 L.Ed. 170 (1918); Aetna Insurance Co. v. Henry DuBois Sons Co., 144 F.2d 262 (2d Cir. 1944), cert. denied, 323 U.S. 797, 65 S.Ct. 440, 89 L.Ed. 636 (1945); cf. Dixey v. Federal Compress & Warehouse Co., 132 F.2d 275 (8th Cir. 1942) (plaintiff's receipt of loan from its insurer was no defense in action by plaintiff against the bailee of plaintiff's goods for defendant's failure to attempt to collect on defendant's insurance policy on plaintiff's goods). But see Willamette-Western Corp., supra (use of loan receipts constituted indirect subrogation in violation of the policy terms). Accordingly, the Court will deny defendant's motion to dismiss this action on the basis of the benefit of insurance clause.
Plaintiff seeks recovery of the $41,527.49 it paid to USS Agri-Chemicals, which represented the loss of 301.47 tons of DAP at $134.00 per ton. Plaintiff contends that it is entitled to recover this amount paid to USS Agri-Chemicals, "unless [plaintiff] paid more than was due," Aiple Towing Co., Inc. v. MV Tri-W, 396 F.Supp. 943 (E.D.La. 1975), and defendants do not dispute this principle of law. However, defendants contend, and the Court is constrained to agree, that plaintiffs did not sufficiently establish that $134.00 per ton was a reasonable price for plaintiff to pay. It was admitted at trial by Robert Coffie that the price of DAP may vary as much as $10.00 or $20.00 in a month. The Court finds it reasonable to award plaintiff $124/ton on the 301.47 ton loss, plus $3.75/ton freight charge, for a recovery on this portion of the cargo loss of $38,512.35.
Plaintiff also seeks recovery of the $3,471.95 paid to The Andersons, and the Court will allow this amount. In addition, plaintiff paid $3,037.50 to North Bend Terminal Company for the extra time required to unload and sort through the cargo from barge ET452 due to the fact that the cargo was damaged, and plaintiff may recover this item as well. Plaintiff's cargo damages, offset by the amount of recovery on salvage, $2,061.99, thus total $42,959.79.
Plaintiff also seeks recovery of a total of $14,085.08 for costs incurred for fleeting, unloading of cargo, supervision, surveys, repairs and incidental expenses. As discussed above, the Court concludes that plaintiff has not established defendant's liability for the damage to the barge. Therefore, the Court will disallow plaintiff's claim for the cost of repairs to the barge, which amounted to $1,260.00. (Stipulation 27). However, expenses incurred due to the fact that the barge was allowed to get into a sinking condition and due to the fact that the cargo was damaged, are recoverable. Therefore, the Court will allow recovery of the expenses reflected in plaintiff's exhibits 23 ($2,605.00), 24 ($2,385.40), 26 ($321.69), 27 ($641.00), 28 ($860.00), 29 ($75.00), 30 ($105.00), 31 ($275.00), 32 ($2,912.69), 33 ($321.80) and 39 ($720.00). The Court will disallow the costs reflected in plaintiff's exhibits 35 ($305.00), 36 ($563.50), 37 ($105.00), 38 ($494.00), and 41 ($135.00) because, in addition to the repair expenses themselves, these items relate to damage caused to the barge itself. In sum, plaintiff's claim for $14,085.08 for fleeting, supervision, repair costs, etc., will be allowed in the amount of $11,222.58.
Plaintiff also seeks recovery of $18,200.00 in damages for loss of use of the barge during the 91 days from February 5, 1978 until May 7, 1978, at the rate of $200/day. The rule is that recovery for loss of use is allowed when profits have been lost and the amount of lost net profits is *74 proven with reasonable certainty. Mid-American Transportation Co. v. Cargo Carriers, Inc., 480 F.2d 1071, 1073 (8th Cir. 1973). In no event is more than lost net profit recoverable. Id. The $200/day figure claimed by plaintiff was not a net profit figure, and plaintiff did not introduce evidence from which a net profit figure could be derived. Accordingly, plaintiff's claim for loss of use must be denied.[1]
In accordance with the foregoing, plaintiff will be allowed recovery in the amount of $54,182.37. Plaintiff requests prejudgment interest of 10% from October 20, 1978, apparently the final date of claim. See plaintiff's exhibit 41 (which was not received into evidence). Prejudgment interest is generally to be awarded, in admiralty cases, from the time expenditures were actually made. Mid-America Transportation Co., Inc. v. Rose Barge Line, Inc., 477 F.2d 914, 916 (8th Cir. 1973). However, the date of expenditure has not been proven for any of plaintiff's items of damage, and plaintiff's letters of claim would not have established these dates. Accordingly, the Court will award prejudgment interest from the date this action was filed, May 24, 1979.
NOTES
[1] In any case, the Court's conclusion that plaintiff has not sufficiently shown that the damages to the barge itself were attributable to defendant would preclude plaintiff's recovery in this respect for the period of use lost by the necessity of repairs to the barge.